Argued August 21, reversed and remanded November 18, 1974

# TRIPLETT, *Petitioner, v.* BOARD OF SOCIAL PROTECTION, *Respondent.*

528 P2d 563

410

*Robert C. Cannon,* Deputy Public Defender, Salem, argued the cause for petitioner. With him on the brief was Gary D. Babcock, Public Defender, Salem.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondent. With him on the brief was Lee Johnson, Attorney General, Salem.

Before SCHWAB, Chief Judge, and FORT and TANZER, Judges.

TANZER, J.

On February 1, 1974, the Board of Social Protection for the State of Oregon ordered the sterilization of petitioner. The case is here upon her petition for judicial review of that order.

Petitioner was referred by the Children's Services Division (CSD) of the Department of Human Resources to the University of Oregon Medical School for evaluation by the Child Rehabilitation Center. As part of the workup for that evaluation she underwent a series of examinations at the Crippled Children's Division of the Medical School. These examinations were conducted by a team of health professionals, headed by Dr. L. Paul Rasmussen, M.D.

Dr. Rasmussen, who had conducted the physical examination of petitioner and prepared a written history, was the first witness to testify at the hearing before the Board of Social Protection. He testified as to the examinations performed and the conferences held by the team. He also testified as to his own observations, opinions and conclusions. Dr. Rasmussen's testimony was not objected to by petitioner.

Next to testify was Dr. Leif Terdal, a psychologist at the Crippled Children's Division and a member of the examining team. Dr. Terdal testified as to his own examination of petitioner and his conclusions and opin-

ions based on that examination. In addition copies of all the reports made by the examining team, which were contained in CSD's files,[1] were admitted into evidence. These included a pediatric report, a physical examination report, a speech and hearing report, an occupational therapy report, a social work report, an orthopedic report, a dental report, a physical therapy report, an opthamology report, a neurology report, a psychological report and a clinic summary. Petitioner objected to the introduction of both Dr. Terdal's testimony and the examination reports on the basis of the physician-patient privilege provided by ORS 44.040(1)(d).

■ Finally, petitioner's caseworker, Elizabeth Hull, was allowed to testify as to her observations and opinions acquired during interviews and home visits, concerning petitioner's mental condition and abilities prior to the clinic examinations. Petitioner objected to this testimony, as well as to the examination reports, on the ground that they were both protected by ORS 411.320, which provides:

> "For the protection of applicants for and recipients of public assistance, the Public Welfare Division and the county public welfare boards shall not disclose or use the contents of any records, files, papers or communications for purposes other than those directly connected with the administration of the public assistance laws of Oregon, and these records, files, papers and communications are considered confidential subject to the rules and regulations of the Public Welfare Division, except as

---

[1] While the Children's Services Division was contained within the Public Welfare Division of the Department of Human Resources at the time petitioner was first referred to the Medical School for evaluation, CSD has since become an independent agency within the Department. This reorganization, however, has no effect on our consideration of this case.

otherwise provided in ORS 411.325 to 411.335. In any judicial proceedings, except proceedings directly connected with the administration of public assistance laws, their contents are considered privileged communications."[2]

We first consider whether Dr. Terdal's testimony and the examination reports were protected by the physician-patient privilege.[3] If we assume for argument that the testimony and reports of non-physicians working as members of a team of health professionals under the direction of a medical doctor come within the protection of the physician-patient privilege,[4] that privilege, nevertheless, is inapplicable here for other reasons.

■ Because the assertion of a statutory privilege is usually an inhibiting limitation upon the discovery of truth, such privileges are in derogation of the common law and should be strictly construed. *See* 8 Wigmore, Evidence, §§ 2380, 2380a; *cf. Nielson v. Bryson,* 257 Or 179, 182, 477 P2d 714 (1970); *Groff v. S.I.A.C.,* 246 Or 557, 565, 426 P2d 738 (1967); Hurley, *Privileged*

---

[2] We construe the statutory reference to the Public Welfare Division to apply equally to those activities of CSD which were performed by the Public Welfare Division prior to the creation of CSD.

[3] We note that Oregon, by statute, specifically provides for a psychologist-patient privilege, ORS 44.040 (1)(h), but no objection was made on this basis. Dr. Terdal was not asked whether he is licensed as required by ORS 44.040 (1)(h) and, therefore, this opinion does not deal with the psychologist-patient privilege. *See State ex rel Juv. Dept. v. Brown,* 19 Or App 427, 528 P2d 569 (1974).

[4] Such a conclusion might follow, by analogy, from cases holding that testimony and reports from an appraiser or physician retained by an attorney fall within the protection of the attorney-client privilege. *See Brink v. Multnomah County,* 224 Or 507, 356 P2d 536 (1960); *City and County of San Francisco v. Superior Court,* 37 Cal2d 227, 231 P2d 26 (1951).

*Communications in Oregon,* 36 Or L Rev 132, 160-161 (1957).

■ The physician-patient privilege created by ORS 44.040 (1) (d) applies only as to "information acquired in attending the patient, which was necessary to enable * * * [the doctor] to prescribe or act for the patient." This language reflects the statutory policy of the physician-patient privilege that confidentiality should be protected only where vital to the attainment of the purposes for which the physician-patient relationship exists, i.e., treatment of medical problems. *See* Wigmore, *supra* at 829. Accordingly, the general rule has long been that where the doctor is consulted for the purpose of examination only, and not for treatment, no privilege exists. *State ex rel Juv. Dept. v. Wade,* 19 Or App 314, 527 P2d 753 (1974) ; *State v. Betts,* 235 Or 127, 140, 384 P2d 198 (1963) ; *State ex rel Juv. Dept. v. Martin,* 19 Or App 28, 526 P2d 647 (1974); *see* Anno. (Physician-Privilege-Examination), 107 ALR 1495.

Here, the record establishes that petitioner was referred to the Medical School for evaluation to determine the degree of her mental retardation, her mental capabilities and possible ways in which she could be helped. CSD, in requesting the examinations, no doubt contemplated a wide range of possibly appropriate responses, including rehabilitative and other non-medical services.

■ There is nothing to indicate that Dr. Terdal and the other members of the examining team were then engaged in or preparing for treatment of petitioner. We conclude that the testimony and reports objected to did not concern information acquired in attending the

petitioner which was necessary to enable the doctors to prescribe or act for her and, therefore, that the physician-patient privilege afforded by ORS 44.040(1)(d) is inapplicable.

■ Even if we assume, again for argument, that there existed a physician-patient privilege, it was, in our opinion, waived by petitioner. When a party fails to object to the privileged testimony of one physician, she waives her physician-patient privilege as to all other testimony and evidence on the same subject. 8 Wigmore, Evidence 862-864, § 2390; *Capron v. Douglass,* 193 NY 11, 85 NE 827 (1908).

Here, Dr. Rasmussen, who headed the examining team, was allowed to testify without objection regarding the entire inter-disciplinary workup and his conclusions based thereon. Any physician-patient privilege which may have existed, therefore, was waived as to further testimony and evidence regarding the examinations.

We next consider whether, as petitioner contends, the testimony of petitioner's caseworker, Ms. Hull, as well as the examination reports, should have been excluded from evidence pursuant to ORS 411.320.

■■ Again, because "the proper assertion of a privileged communication may be expected * * * to be an inhibiting limitation upon the discovery * * * of the truth," *Groff v. S.I.A.C.,* supra, and because "withholding of public records is the exception, not authorized unless a statute so provides," *Stivahtis v. Juras,* 13 Or App 519, 511 P2d 421 (1973), the privilege created by ORS 411.320 should be narrowly interpreted. Because petitioner's family receives benefits under the state's Aid to Dependent Children (ADC) program,

however, the state statute must also be interpreted in a manner consistent with 42 USC § 602 (a) and the regulations promulgated by the Department of Health, Education and Welfare (HEW). *Drago v. Public Welfare Division,* 18 Or App 507, 525 P2d 1065 (1974); *Bunting v. Juras,* 11 Or App 297, 502 P2d 607 (1972).

42 USC § 602 (a) provides:

"A State Plan for aid and services to needy families with children must * * * (9) provide safeguards which restrict the use or disclosure of information concerning applicants and recipients to purposes directly connected with the administration of aid to families with dependent children * * *."

■ It is clear, first of all, that both the examination reports and the testimony of Ms. Hull related information concerning an ADC recipient. The reports are covered by 45 CFR § 205.50 (a)(2)(i), which, interpreting the federal statute, provides:

"Types of information to be safeguarded include but are not limited to:

"* * * * *

"(d) medical data, including diagnosis and past history of disease or disability, concerning a particular individual."[6]

As to the testimony of Ms. Hull, the same principles of confidentiality would apply to information acquired by her in the course of her work as would apply to any other type of safeguarded information.

Because the examination reports and Ms. Hull's

---

[6] Although the examination reports do not consist entirely of medical data, they are of a character, when taken as a whole, which, in our opinion, warrants their inclusion within the scope of the federal regulation. We note, also, that the federal regulation is intended to provide an illustrative, rather than an exclusive, list of the types of information to be safeguarded.

testimony related information within the scope of protection provided by the federal statute, ORS 411.320 forbids their use as evidence before the Board of Social Protection unless the proceeding was for a purpose directly connected with the administration of aid to families with dependent children. We proceed, therefore, to consider whether or not the involuntary sterilization proceeding was for such a purpose.

HEW regulations specify that purposes directly connected with the administration of aid to families with dependent children include "establishing eligibility, determining the amount of assistance, and providing services for applicants and recipients." 45 CFR § 205.50 (a)(1)(i). The proceedings here do not relate to determining eligibility or the amount of assistance. It remains only for us to determine whether they were for the purpose of providing petitioner a service.

45 CFR § 205.35 (a)(1)(i), Federal Register, Vol 39, No 26, 4733 (February 6, 1974), states:

"A State plan * * * must provide that * * * [i]n addition to any other requirement of this paragraph, no nonemergency sterilization may be performed unless such sterilization is performed pursuant to a voluntary request for such services made by the person on whom the sterilization is to be performed or by his or her representative * * *."

Oregon has amended its state plan to conform with this federal regulation. SRS Program Regulation 10-15 (C-4) (April 18, 1974). In a note attached to the amendment, CSD stated that the amendment was only to satisfy federal requirements and that, in fact, sterilizations are not provided under Oregon's ADC program.

■ We can only conclude that involuntary sterilization is not a service under the ADC program and that, consequently, the proceedings before the Board of Social Protection were not for a purpose directly connected to the administration of the program. Interpreting ORS 411.320 in a manner consistent with federal requirements, we hold, therefore, that the examination reports and the testimony of Ms. Hull were protected thereby.[6]

■ The protection afforded by ORS 411.320, however, is in the form of a privilege and, like that of any privilege, may be waived. 8 Wigmore, Evidence 853, § 2388.

■ As we interpret it, the privilege of ORS 411.320 applies to any information acquired in the course of health examinations which have been requested by a recipient's caseworker. It is the client's communication to the agency or its agents which is privileged, and the protection applies equally whether evidence of the communication comes from welfare files or from the mouth of a witness.[7]

The testimony of Dr. Rasmussen, then, was also

[6] The state argues that in light of the policy against evidentiary privileges, the concept of "the public assistance laws" found in the requirement of ORS 411.320 that the disclosure be for purposes "directly connected with the administration of the public assistance laws" is a broad one and that the proceeding before the Board in this case comes within that concept. We simply reiterate that the language of the state statute must be given meaning consistent with the somewhat more specific language of 42 USC § 602 (a)(9). Further, the phrase "public assistance" should be construed to relate to the purposes of ORS ch 411 in which it appears, rather than broadly.

[7] To condition protection on whether or not the information is contained in the welfare files would be inconsistent with cases interpreting the attorney-client privilege. Those cases have held that a physician retained by a client's attorney is merely the attorney's agent and any information acquired by the phy-

within the protection of the welfare confidentiality privilege. It follows, for reasons analogous to those discussed in regard to the physician-patient privilege above, that petitioner's failure to object to Dr. Rasmussen's testimony constituted a waiver of her welfare confidentiality privilege as it pertained to the examination reports which were comprehended by his testimony.

The testimony of Ms. Hull, however, was not concerned with the examinations conducted at the Crippled Children's Division but, rather, related her observations and opinions, acquired during interviews and home visits, concerning petitioner's mental condition and abilities extraneous to the medical and psychological evaluations. The waiver based on failure to object to Dr. Rasmussen's testimony was co-extensive with the subject matter of that testimony. It did not, therefore, constitute a waiver of her welfare confidentiality privilege as it pertained to subject matter of Ms. Hull's testimony. Accordingly, the admission of her testimony constituted error.

Since our interpretation of ORS 411.320 requires that the order of the Board be reversed, and because we do not know whether the Board will arrive at the same decision based on the remaining or new evidence, we do not now reach petitioner's final contention that the Board's order was in violation of her First Amendment right to free exercise of religion.

Reversed and remanded for further proceedings consistent with this opinion.

---

sician in examining the client, therefore, comes within the protection of the attorney-client privilege. *See, e.g., City and County of San Francisco v. Superior Court,* supra at n 4. The same principles are applicable to the welfare confidentiality privilege.