Argued and submitted December 8, 1983, affirmed in part, reversed in part and remanded June 6, reconsideration denied July 27, petition for review allowed August 28, 1984 (297 Or 781)
See 298 Or 706, 696 P2d 527 (1985)

# HUMPHERS,
*Appellant,*

*v.*

# FIRST INTERSTATE BANK OF OREGON,
*Respondent.*

(A8209-05889; CA A28047)

684 P2d 581

David J. Sweeney, Portland, argued the cause for appellant. With him on the briefs were Judith A. Scholz, and Mark B. Weintraub, Certified Law Student, Portland.

Cynthia S.C. Shanahan, Portland, argued the cause for respondent. With her on the brief were Ridgway K. Foley, Jr., P.C. and Schwabe, Williamson, Wyatt, Moore & Roberts, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

ROSSMAN, J.

Warren, J., concurring in part; dissenting in part.

## ROSSMAN, J.

Plaintiff appeals the dismissal of her first amended complaint for outrageous conduct, medical malpractice, breach of confidential relationship, invasion of privacy and breach of contract. We affirm in part and reverse in part.

Plaintiff's factual allegations are, in pertinent part:

"III

"On February 2, 1959, there was born to the plaintiff, then known as Ramona Elwess, a child in St. Charles Medical Center, Bend, Deschutes County, Oregon. Plaintiff was also known by her maiden name, Ramona Jean Peek. Plaintiff had been previously married, but was unmarried at the time of the birth. Harry E. Mackey registered plaintiff in St. Charles Medical Center as 'Mrs. Jean Smith' and delivered her baby. Plaintiff made her real name known only to Dr. Mackey.

"IV

"On February 3, 1959, plaintiff consented to the adoption of her child by Leslie Arnold Swarens and Shirley Lee Swarens of Bend, Deschutes County, Oregon. The daughter was named Leslie Dawn Swarens. She is now known as Dawn Kastning.

"V

"Plaintiff's medical records at St. Charles Medical Center were thereafter sealed and stated on their face that they were not public.

"VI

"Plaintiff subsequently married, had children, and raised a family. Plaintiff's mother and husband were the only people other than Dr. Mackey to know of the existence of her adopted daughter. Dawn Kastning did not know the identity of her biological mother.

"VII

"On or about September 29, 1980, Ms. Kastning contacted Dr. Mackey and expressed an interest in contacting her biological mother. Ms. Kastning had been unable to gain access to her confidential adoption file in the District Court of the State of Oregon of the County of Deschutes. Dr. Mackey agreed to assist Ms. Kastning in ascertaining the identity and whereabouts of plaintiff.

"VIII

"Dr. Mackey provided Ms. Kastning with a letter, dated September 29, 1980, in which he stated that he had registered

plaintiff at the hospital and delivered Ms. Kastning; that plaintiff's name was Ramona Jean Peck *[sic];* that he was unable to locate his medical records, but he distinctly remembered having administered to her a medication known as diethystilbestrol; that because of side effects of that drug, it was important for Ms. Kastning to contact plaintiff.

"IX

"The above letter was intended to cause any reader who was charged with maintaining the confidentiality of Ms. Kastning's adoption records and birth certificate to breach the confidentiality of those records and allow Ms. Kastning to view them.

"X

"On or about June 1, 1982, personnel at St. Charles Medical Center, in reliance upon Dr. Mackey's letter, allowed Ms. Kastning to view and make copies of plaintiff's medical records.

"XI

"Said personnel would not have permitted such viewing, but for the false statements in Dr. Mackey's letter.

"XII

"As a result of Dr. Mackey's false statements and Ms. Kastning's consequent ability to view plaintiff's confidential records, Ms. Kastning was able to discover the identity and whereabouts of plaintiff, in spite of plaintiff's efforts to keep her identity unknown to Ms. Kastning."

The complaint alleged five torts in separate counts. Because the trial court's judgment constitutes a dismissal of each of plaintiff's five claims, we must necessarily decide the validity of each claim.

## I. OUTRAGEOUS CONDUCT

■ ■　　Plaintiff's first claim is for outrageous conduct causing severe emotional distress. Outrageous conduct is an intentional tort which requires inflicting actual mental suffering on the plaintiff to be the deliberate purpose of the defendant's conduct. *Brewer v. Erwin,* 287 Or 435, 457, 600 P2d 398 (1979). However, the tortious purpose can be found in the breach of some obligation that attaches to a defendant's responsibility toward the plaintiff. 287 Or at 457. In this case, Dr. Mackey had been plaintiff's treating physician. The physician-patient relationship is sufficient to create the duty; and defendant may therefore be liable, even if Mackey did not

have as his deliberate purpose inflicting actual mental suffering on plaintiff. *Rockhill v. Pollard,* 259 Or 54, 63, 485 P2d 28 (1971).

■■    However, plaintiff still must allege and prove that the means of inflicting the injury were "extraordinary." *Brewer v. Erwin, supra,* 287 Or at 457. "Lack of foresight, indifference to possible distress, even gross negligence, is not enough to support this theory of recovery." *Hall v. The May Dept. Stores,* 292 Or 131, 135, 637 P2d 126 (1981). In order for plaintiff to recover, she must allege and prove that the offensiveness of Mackey's conduct "exceeds any reasonable limit of social toleration." 292 Or at 137. We hold, as a matter of law, that reasonable persons could not differ that the conduct alleged in plaintiff's complaint was not so extreme and outrageous that it exceeded any reasonable limit of social toleration and justified plaintiff's recovery against defendant for outrageous conduct. *Pakos v. Clark,* 253 Or 113, 132, 453 P2d 682 (1969). Therefore, the trial court was correct in granting defendant's motion to dismiss plaintiff's claim for outrageous conduct.

## II.    MEDICAL MALPRACTICE

■■    Plaintiff's second claim is for medical malpractice. Under the allegations in the complaint, it is possible that plaintiff could prove that Mackey's conduct in providing her name and giving the letter to Dawn Kastning (Dawn), fell below "the standard of reasonable conduct deemed to have been set by the community." *Simpson v. Sisters of Charity of Providence,* 284 Or 547, 588 P2d 4 (1978). However, it is axiomatic that a physician, merely because of his trade, does not have a greater responsibility in nonmedical matters than that of the general public. An action for medical malpractice will only lie for activities in which the defendant was involved in the practice of medicine. The issue, therefore, is whether Mackey's action in revealing plaintiff's name and giving the letter to Dawn over 20 years after he had terminated his treatment constitutes the practice of medicine. We hold that it does not.

Nothing that Mackey did in 1980 had or could have had any medical effect on plaintiff's condition. In fact, the condition for which Mackey had treated plaintiff (pregnancy) had not been in existence for 20 years. The mere fact that

Mackey utilized his medical records to enable him to take the action in 1980 does not make the action the practice of medicine. Certainly, no reasonable person would conclude that a retired doctor would violate a prohibition against practicing medicine if he looked at his former records and revealed to a patient something that was contained therein. Mackey's actions in 1980 do not constitute the practice of medicine and cannot render his estate liable for an action for medical malpractice. The trial court properly granted defendant's motion to dismiss the count for medical malpractice.

## III.   BREACH OF CONFIDENTIAL RELATIONSHIP

Plaintiff's third count is for breach of a confidential relationship. The availability of a civil remedy for breach of a confidential relationship between a physician and a patient is an issue which has never been decided in this state. At common law, there was no physician-patient privilege of any kind. A physician could be required to testify in court the same as any other witness, and the patient had no right to limit the physician's disclosure of any information obtained during treatment. *Forrest v. Portland Ry. L. & P. Co.,* 64 Or 240, 243, 129 P 1048 (1913); *State v. Wright,* 31 Or App 1351, 1354, 572 P2d 669 (1977).

Two statutes in Oregon have arguable relevance to a physician-patient privilege. The most obvious is OEC 504-1(2), which provides:

"A patient has the privilege to refuse to disclose and to prevent any other person from disclosing confidential communications *in a civil action,* suit or proceeding made for the purposes of diagnosis or treatment of the patient's physical condition, among the patient, the patient's physician or persons who are participating in the diagnosis or treatment under the direction of the physician, including members of the patient's family." (Emphasis supplied.)

This statute and its predecessors have strictly been construed on the theory that "a statutory privilege is usually an inhibiting limitation upon the discovery of truth." *Triplett v. Bd. of Social Protection,* 19 Or App 408, 413, 528 P2d 563 (1974). "The privilege was created and is limited by the statute." *State v. Wright, supra,* 31 Or App at 1354. We have held that the statute and its predecessor do not cover testimony in a criminal proceeding or testimony of a doctor who is consulted for an examination only and provided no treatment. *State v.*

*Wright, supra; Triplett v. Bd. of Social Protection, supra.* OEC 504-1(2) cannot reasonably be expanded to justify a civil remedy for violation of the physician-patient confidential relationship.

■ The other Oregon statute which relates to the physician-patient relationship is contained in the rules governing licensing of physicians. ORS 677.190(5) provides as a ground for suspending, revoking or refusing to grant a license, registration or certification "wilfully or negligently divulging a professional secret." Although that is clearly a ground for administrative action, the statute does not create a civil liability for such action. If we were to find such civil liability solely on the basis of the statute, liability would also flow from other provisions of the same statute. Clearly, there is no civil liability for "employing any person to solicit patients for the licensee," "habitual or excessive use of intoxicants, drugs or controlled substances," "using the name of the licensee under the designation 'doctor' * * * with reference to the commercial exploitation of any goods, wares or merchandise," or several other of the specific reasons which are given in ORS 677.190 as grounds for suspension, revocation or refusal of a license. The statute was clearly created to allow the Board of Medical Examiners to control physicians in Oregon through its power to revoke, suspend or refuse a license to practice. Specific penalties are set forth for violations of the provisions of the act, none of which include civil recovery. We hold that the provisions of ORS chapter 677 do not, in and of themselves, create any civil liability.

■ The question therefore is whether a physician-patient duty of confidentiality exists in Oregon in spite of the absence of such a rule in common law and of any statute creating such a right. There is no doubt that the Court of Appeals and the Supreme Court both have the authority to recognize previously unrecognized rights of recovery or new forms of injury in tort law. *Norwest v. Presbyterian Intercommunity Hospital,* 52 Or App 853, 855, 631 P2d 1377, *rev den* 291 Or 771 (1981). When confronted with conduct causing injuries that the court concludes should be compensated, neither the Supreme Court nor the Court of Appeals has hesitated to create new torts and has not felt unduly restricted by the bounds of common law remedies. *See, e.g., Pakos v.*

*Clark, supra* (creating tort of intentional infliction of emotional distress by outrageous conduct) and *Hinish v. Meier & Frank Co.*, 166 Or 482, 113 P2d 438 (1941) (creating tort of invasion of privacy).

The issue of civil recovery for violation of physician-patient confidentiality in the absence of a specific statute creating that right is by no means unique to Oregon. A majority of the states which have considered the issue have held that there is a civil right to recover for violation of confidentiality between a physician and patient, even when there is no privilege created by statute.[1] The courts which have created a right of action for breach of a physician-patient confidential relationship have generally based it on public policy. They have found the policy in evidentiary rules excluding testimony of physicians from court, in licensing statutes similar to that cited above for Oregon, in the Hippocratic oath and in Principle 9 of the Medical Ethics Code of the American Medical Association.[2] *Hammonds v. Aetna Casualty & Surety Company,* 243 F Supp 793 (ND Ohio 1965); *Horne v. Patton,* 287 So2d 824 (1973).

In *Patton,* the Alabama court noted those bases for liability and concluded that public policy in Alabama

---

[1] The states which have held that there is a civil recovery for violation of the confidential relationship between physician and patient in the absence of a specific statute are Alabama, *Horne v. Patton,* 287 So2d 824 (1973); Illinois, *Geisberger v. Willuhn,* 72 Ill App 3d 435, 390 NE2d 945 (1979); New Jersey, *Hague v. Williams,* 37 NJ 328, 181 A2d 345 (1962); New York, *Doe v. Roe,* 400 NYS2d 668 (1977), and Washington, *Smith v. Driscoll,* 94 Wash 441, 162 P 572 (1917). In addition, a federal district court has held, under the law of Ohio, that such recovery is available. *Hammonds v. Aetna Casualty and Surety Company,* 243 F Supp 793 (ND Ohio 1965).

A holding that no private right of action exists for violation of the physician-patient confidential relationship in the absence of statutory authority has been made by the state court in Tennessee, *Quarles v. Sutherland,* 389 SW2d 249 (1965), and by federal courts in the District of Columbia, *Logan v. District of Columbia,* 447 F Supp 1328 (1978), and Georgia, *Collins v. Howard,* 156 F Supp 322 (1957).

[2] The Hippocratic oath states, in pertinent part:

"Whatever in connection with my professional practice, or not in connection with it, I see or hear, in the life of men, which ought not be spoken of abroad, I will not divulge, as reckoning that all such should be kept secret."

Principle 9 of the Medical Ethics Code states:

"A physician may not reveal the confidences entrusted to him in the course of medical attendance, or the deficiencies he may observe in the·character of patients, unless he is required to do so by law or unless it becomes necessary in order to protect the welfare of the individual or of the community."

"requires that information obtained by a physician in the course of a doctor-patient relationship be maintained in confidence, unless public interest or the private interest of the patient demands otherwise. * * * What policy would be served by according the physician the right to gossip about a patient's health?" 287 So2d at 829.

The same rationale was adopted by the New Jersey court in *Hague v. Williams,* 37 NJ 328, 181 A2d 345 (1962), which involved a plaintiff suing a doctor who had told an insurance company that a baby had heart trouble from its birth and so benefits were denied under a life insurance policy. At the time of the *Hague* decision, no statute in New Jersey even protected a patient from disclosure by a physician in court of information obtained during treatment. However, the *Hague* court concluded that the ethical requirements of the medical profession propounded under its own code, are "well expressive of the inherent legal obligation which a physician owes to his patient." 181 A2d at 348. The *Hague* court further noted that the right of the patient was limited by the supervening interests of society which justified the physician's disclosure in that case. 181 A2d at 349.

We agree with the jurisdictions that have found a strong public policy in favor of confidentiality in physician-patient relationships. Although they alone do not create a civil remedy, OEC 504-1(2) and ORS 677.190(5) amply demonstrate such a public policy in Oregon. It is also demonstrated by the Hippocratic oath and the ethical code of the American Medical Association. The only issue, therefore, is whether such public policy results in a private right of action. We agree with the majority of courts in holding that, "for so palpable a wrong, the law provides a remedy." *Smith v. Driscoll,* 94 Wash 441, 162 P 572, 573 (1977).

As recognized by the Alabama court in *Horne v. Patton, supra,* there is widespread public knowledge of the ethical standards of the medical profession and widespread belief that confidences made by a patient to a physician may not be disclosed without the permission of the patient. Patients in Oregon have the right to rely on this common understanding of the ethical requirements which have been placed on the medical profession and to obtain damages against a physician if he violates such confidentiality. It says

much about the medical profession in Oregon that it has not been necessary to recognize a tort for breach of a confidential relationship before this date. However, the fact that the medical profession in the past has consistently kept its confidences does not mean that a patient should not be able to recover civil damages against a physician who violates that obligation. We therefore hold that there is a civil right of recovery against a physician for breach of a confidential relationship with his patient.

■ The dissent argues that we should not create new torts when recovery is available for invasion of privacy. It should be noted that this court did not have the option of not making new law. On a motion to dismiss, we cannot avoid consideration of the adequacy of one count by concluding that another count is sufficient. We are required to determine whether any plaintiff in Oregon can civilly recover against a physician for breach of a patient's confidential relationship. We agree with the majority of courts that have considered the issue in holding that such a tort does exist.

■ The next issue which must be resolved is whether plaintiff adequately has alleged such a tort. Defendant argues that the allegations are insufficient, relying on cases which hold that the disclosure of only a patient's name is not a violation of the confidential relationship. However, Mackey did not merely reveal to Dawn the name of plaintiff in the abstract. He revealed to Dawn that plaintiff was the woman whom he had treated for pregnancy and delivery of a live baby some 20 years before. He further revealed to Dawn that she was the baby that had been delivered at that time. Finally, he revealed the medication which was used during the pregnancy in treatment of plaintiff. Such a revelation constitute far more than the mere furnishing of the name of the patient. Mackey actually revealed details which could only have been obtained through the course of his treatment of plaintiff and which constituted privileged communications. The allegations of plaintiff adequately set forth a count for breach of the confidential relationship of a physician and a patient. The trial court's order dismissing this count of plaintiff's complaint is reversed.

## IV. INVASION OF PRIVACY

Plaintiff's fourth claim for relief is for invasion of privacy. It is well established in Oregon that damages may be recovered for invasion of privacy. *McLain v. Boise Cascade Corp.*, 271 Or 549, 533 P2d 343 (1975); *Hinish v. Meier & Frank Co., supra.*

"To prevail on a claim based on the tort of invasion of privacy, plaintiff must show: (1) an intentional intrusion physically or otherwise; (2) upon plaintiff's 'private affairs or concerns;' and (3) that the intrusion would be offensive to a reasonable person." *Oliver v. Pacific Northwest Bell*, 53 Or App 604, 607, 632 P2d 1295, *rev den* 292 Or 108 (1981).

In nearly all of the Oregon opinions discussing invasion of privacy, the court has cited with approval the definitions of invasion of privacy given in the Restatement. According to the Restatement, there are four different types of invasion of privacy, only one of which is applicable here.[3] This tort is for intrusion upon seclusion and requires no publication. The tort, as defined by the Restatement, is as follows:

"(c)    The defendant is subject to liability under the rules stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.

"\* \* \* \* \*

"(d)    There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object." Restatement (Second) Torts § 652 b, comments *c* and *d* (1977).

In this case, plaintiff has alleged that Mackey intruded upon a seclusion which she had drawn over a particular section of her life, that is, the fact that she had a child and had given it up for adoption, by informing Dawn of the identity of plaintiff and by giving her a letter to be shown to hospital personnel which would inform them of the identity of plaintiff and allow her to locate plaintiff. Such actions constitute a substantial interference with the seclusion which

---

[3] All of the other types of invasion of privacy listed in the Restatement require publication beyond the very limited publication alleged in this case.

plaintiff had deliberately placed over a portion of her life. We cannot say as a matter of law that such interference is not of the kind which is highly offensive to an ordinary, reasonable person or is not the result of conduct to which a reasonable person would strongly object. These are questions which should have been left to a jury determination. This conclusion is consistent with that of other jurisdictions which have almost universally recognized that such a disclosure is a violation of the patient's right to privacy. *Logan v. District of Columbia, supra,* 447 F Supp 1328, 1330 (1978); *Hammonds v. Aetna Casualty & Surety Co., supra,* 243 F Supp at 801; *Doe v. Roe, supra,* 400 NYS2d 668, 675 (1977); *Horne v. Patton, supra,* 287 So2d at 830; *Geisberger v. Willuhn,* 72 Ill App 3d 435, 390 NE2d 945, 948 (1979). The trial court erred in dismissing plaintiff's count for invasion of privacy. That portion of the trial court' order is therefore reversed.

## V.  CONTRACT CLAIM

█        Plaintiff's final claim for recovery is for an agreement, express or implied, for confidentiality. An implied contract is recognized under the law of the state of Oregon, if the natural and just interpretation of the parties warrants such a conclusion. *Owen v. Bradley,* 231 Or 94, 103, 371 P2d 966 (1962). Virtually every jurisdiction which has considered the topic has concluded that there is an implied agreement by a physician to keep in confidence all disclosures made by the patient concerning the patient's physical or mental condition, as well as all matters discovered by the physician in the course of examination or treatment. *Doe v. Roe, supra,* 400 NYS2d at 674; *MacDonald v. Klinger,* 446 NYS2d 801, 84 AD2d 482 (1982); *Geisberger v. Willuhn,* 390 NE2d at 948; *Horne v. Patton, supra,* 287 So2d at 832; *Quarles v. Sutherland, supra,* 389 SW2d at 252.

█        Nonetheless, we need not decide whether such an implied contract exists in Oregon because, even if it does, plaintiff has failed to adequately allege damages. The only allegation of damage for breach of an implied or express contract is:

> "As a result of these disclosures, plaintiff has become severely worried, sleepless, humiliated, embarrassed and otherwise unable to function normally."

Thus, plaintiff has only alleged mental distress damages, which are not recoverable in a breach of contract claim. *Farris v. U.S. Fid. & Guar. Co.,* 284 Or 453, 465-66, 587 P2d 1015 (1978). The trial court correctly granted the motion to dismiss plaintiff's fifth claim.

We affirm the trial court's dismissal of plaintiff's first, second and fifth counts, but reverse the dismissal of plaintiff's third and fourth counts.

Affirmed in part; reversed in part; and remanded.

**WARREN, J.,** concurring in part; dissenting in part.

I agree with the majority that this case must be reversed. I disagree only with that portion of the opinion which purports to create a new tort called "breach of confidential relationship."

The majority creates a new tort without favoring us with a statement of its elements or telling us why a new tort is necessary. The tort of invasion of privacy is 43 years old and is alive and well in Oregon. *See Hinish v. Meier & Frank Co.,* 166 Or 482, 113 P2d 438 (1941).

The majority holds that plaintiff's complaint states a cause of action for invasion of privacy in that it alleges an intentional intrusion on plaintiff's private affairs, which would be offensive to a reasonable person. Clearly, a physician who has a confidential relationship with a patient and a duty not to disclose the private matters of those who trust his discretion, invades his patient's right to privacy when he breaches that trust. The majority says all it needs to when it says:

> " * * * This conclusion [that such a disclosure is a violation of the patient's right to privacy] is consistent with that of other jurisdictions which have almost universally recognized that such a disclosure is a violation of the patient's right to privacy * * *." 68 Or App at 584.

The cases cited by the majority do not hold that there is a new and separate tort of "breach of confidential relationship." The most that can be said of any of them is that they hold that a physician has a duty not to divulge private facts about his patient and, if he does, he must respond in

damages. Several of the cases cited by the majority expressly characterize the cause of action as one for invasion of privacy; the balance do not identify any legal theory.

As can be seen, I do not disagree that plaintiff can recover for the physician's breach of his confidential relationship but, for her to do that, no new legal theory is necessary.