778 P.2d 634

**Russell C. DUQUETTE and Karen Loften Duquette, husband and wife; and Scottsdale Memorial Health Systems, Inc., d/b/a Scottsdale Memorial Hospital, Petitioners,**

v.

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, Honorable William T. Moroney and Honorable Stanley Z. Goodfarb, judges thereof, Respondent Judges,**

**Eric LAMBERTY, et al., Real Parties in Interest.**

No. 1 CA–SA 88–192.

Court of Appeals of Arizona, Division 1, Department C.

Aug. 3, 1989.

**270**

Fennemore Craig, P.C. by R.C. Mitten, Timothy Berg, Phillip Fargotstein and Christopher P. Staring, Phoenix, for petitioners.

Hill & Midgley by James W. Hill, Phoenix, for real parties in interest.

Langerman Law Offices by Amy G. Langerman, Phoenix, for amicus curiae Arizona Trial Lawyers Ass'n.

Harris & Palumbo, P.C. by Kevin W. Keenan, Phoenix, for amicus curiae.

## OPINION

CONTRERAS, Judge.

In this special action, we consider the issue of whether defense counsel in a medical malpractice action may engage in *ex parte* communications, with the plaintiff's treating physicians without having obtained plaintiff's consent. We conclude that defense counsel may not engage in such non-consensual *ex parte* communications but are limited to the formal discovery methods provided by the Arizona Rules of Civil Procedure.

## UNDERLYING MEDICAL MALPRACTICE ACTION

The real parties in interest in this litigation are a minor child, Eric Lamberty, (plaintiff or Eric) and his parents (Lambertys or plaintiffs) who, acting on Eric's behalf, filed a medical malpractice action in the Maricopa County Superior Court. On September 23, 1983, Eric was delivered at Scottsdale Memorial Hospital by Dr. Russell Duquette. Dr. Duquette was a resident physician in Scottsdale Memorial Hospital's family practice clinic. During his first year of life, Eric was seen by Dr. Duquette for periodic "well baby" visits and for a variety of other medical conditions. Eric was also seen during this time by numerous other physicians. In August, 1984, Eric was diagnosed as having a dermoid tumor in and around his spinal column. The tumor required surgery. In connection with the diagnosis of the tumor and the resulting surgery, Eric saw at least four other physicians. Following the surgery, the Lambertys filed a civil action against Dr. Duquette alleging that he committed medical malpractice by failing to: (1) treat Eric properly during his birth hospitalization, and (2) diagnose the tumor in a timely fashion. Scottsdale Memorial Hospital was also a named defendant under an agency theory of liability.

In the summer of 1987, defense attorneys for petitioners conducted *ex parte* interviews of approximately thirteen of plaintiff's treating physicians without the express consent of plaintiff, his parents, or his counsel. On June 23, 1987, defense counsel submitted a list of witnesses and exhibits for use at a medical liability review panel hearing. The list identified as witnesses the treating physicians who had been interviewed in *ex parte* fashion. On March 4, 1988, plaintiffs filed a motion to bar testimony and to disqualify counsel. In their motion, plaintiffs requested an order: (1) barring Eric's treating physicians from testifying as expert witnesses for petitioners, and (2) disqualifying defense counsel from representing petitioners.

On July 25, 1988, trial Judge William Moroney[1] ruled "... that A.R.S. [§] 12–2235 prohibits ex-parte communication between Defendants' attorneys and treating physicians of the Plaintiff, unless the Plaintiff has given his express permission for such a conference." He then issued an order barring Eric's treating physicians from testifying as expert witnesses for the petitioners unless they were first offered as witnesses by plaintiffs. Judge Moroney did not, however, disqualify defense counsel from further participation in the case.

Petitioners seek special action review of that portion of Judge Moroney's order barring plaintiff's treating physicians from testifying as expert witnesses unless first offered as witnesses by plaintiffs. Leave to file an *amicus curiae* brief was given to the Arizona Trial Lawyers Association, and it has done so.

## SPECIAL ACTION JURISDICTION

■ Petitioners contend that this court should accept special action jurisdiction because they lack an equally plain, speedy, and adequate remedy by appeal, and because this case presents an issue of state-wide significance to the Bar and litigants in personal injury cases.

Traditionally, this court has declined to accept special action jurisdiction where the nature of the special action involves a discovery dispute. Instead, this court has held that petitioners in such a special action

would have an adequate post-trial remedy on direct appeal. *U. Totem Store v. Walker,* 142 Ariz. 549, 551, 691 P.2d 315, 317 (App.1984). We are persuaded, however, by petitioners' argument that this case presents an issue of state-wide significance. We note that other jurisdictions which have previously considered the propriety of *ex parte* interviews are split in their resolution of the issue. *See* Annot., 50 ALR 4th 714, *Discovery: Right to Ex Parte Interview with Injured Party's Treating Physician.* We also note the lack of case law in Arizona on this issue, as well as what is arguably a conflict between Arizona ethics opinions which have considered the propriety of *ex parte* interviews in varying contexts.[2] Since an issue of state-wide significance is presented, and in order to clarify and declare the law in Arizona on this issue, we accept special action jurisdiction.

## WAIVER OF PHYSICIAN–PATIENT PRIVILEGE

The briefs filed in this case by petitioners, real parties in interest, and *amicus curiae,* Arizona Trial Lawyers Association, present numerous arguments in support of and in opposition to *ex parte* communications.[3] We will address these arguments in turn. In their petition for special action, petitioners first contend that the *ex parte* communications between plaintiff's treat-

1. Although the order which is the subject of this special action was issued by Judge Moroney, petitioners have also named Judge Stanley Z. Goodfarb as a respondent because he has taken over Judge Moroney's civil calendar, and is, therefore, the present trial judge in the underlying action.

2. *Compare* Ethics Opinion No. 88–01 (January 11, 1988) (a lawyer may not ethically conduct an *ex parte* interview with an expert witness designated by opposing counsel for use at trial) *with* Ethics Opinion No. 78–23 (July 10, 1978) (a lawyer may ethically engage in *ex parte* communications with plaintiff's treating physicians so long as he does not deliberately induce a breach of the physician-patient privilege). In fact, these opinions are *not* in conflict. A plaintiff's treating physician is not an "expert witness" within the meaning of Rule 26(b)(4), Arizona Rules of Civil Procedure, because the facts

known and opinions held by a treating physician are not "acquired or developed in anticipation of litigation or for trial." Therefore, the specific issue addressed in No. 78–23 is not within the parameters of the opinion issued in No. 88–01, and the Opinions may be harmonized. However, the parties appear to consider the Opinions to be in conflict, and a minute entry authored by a Maricopa County Superior Court judge entered in another case which has been appended to petitioners' Memorandum of Points and Authorities in support of their Petition for Special Action also treats the Opinions as conflicting. We therefore cite these Opinions in our discussion.

3. The parties to this special action have used the terms "contacts," "conferences," "communications," and "interviews" in reference to *ex parte* communications between petitioners' defense counsel and Eric's treating physicians.

ing physicians and defense attorneys were not improper because the physician-patient privilege had been waived. We initially note that the physician-patient privilege in Arizona is statutory. *See* A.R.S. § 12–2235 (1982).[4] The Arizona statute precludes a physician from being examined about any communications made by the patient concerning his condition or any knowledge of the condition obtained through personal examination of the patient without the consent of the patient. *Id.*

■ The holder of the privilege is the patient,[5] and he may waive the privilege. *See* A.R.S. § 12–2236 (1982).[6] The statute regarding waiver provides that a person who offers himself as a witness and voluntarily testifies about the otherwise privileged communications thereby consents to the examination of the physician. Eric's parents have not offered themselves as witnesses, and have not voluntarily testified concerning their son's medical condition. Although Mr. and Mrs. Lamberty have been deposed by petitioners, their testimony by way of deposition does not waive the physician-patient privilege because it was not voluntarily given. *See Buffa v. Scott,* 147 Ariz. 140, 142, 708 P.2d 1331, 1333 (App.1985). Therefore, the Lambertys have not expressly waived the physician-patient privilege under Arizona statutory law.

Despite the lack of an express waiver, petitioners contend that the actions of the real parties in interest in this case constitute an implied waiver of the physician-patient privilege. Specifically, petitioners contend that the real parties in interest waived the privilege when they: 1) placed Eric's medical condition in issue by filing suit, 2) claimed Eric's medical expenses as damages in their civil complaint, and 3) failed to object to the testimony of Eric's

treating physicians when that testimony was offered at the medical liability review panel hearing.

■ Arizona has recognized the concept of implied waiver. In *Bain v. Superior Court,* 148 Ariz. 331, 334, 714 P.2d 824, 827 (1986), the Arizona Supreme Court stated that when a plaintiff "places a particular medical condition at issue by means of a claim or affirmative defense, ... then the privilege will be deemed waived with respect to that particular medical condition." In accordance with *Bain,* we conclude that Eric's parents have waived the physician-patient privilege by placing their son's medical condition at issue through initiation of litigation.

■ This waiver is not absolute however, and we believe petitioners' reliance on implied waiver in support of the propriety of *ex parte* communications is misplaced. In this regard, we agree with those cases which conclude that even where the physician-patient privilege has been impliedly waived, the holder of the privilege waives *only* his right to object to discovery of pertinent medical information which is sought through the formal methods of discovery authorized by the applicable Rules of Civil Procedure. *See Weaver v. Mann,* 90 F.R.D. 443 (D.N.D.1981); *Garner v. Ford Motor Co.,* 61 F.R.D. 22 (D. Alaska 1973); *Hammonds v. Aetna Casualty & Sur. Co.,* 243 F.Supp. 793 (N.D. Ohio 1965); *Wenninger v. Muesing,* 307 Minn. 405, 240 N.W.2d 333 (1976); *Jaap v. District Court of Eight Judicial Dist.,* 623 P.2d 1389 (Mont.1981); *Anker v. Brodnitz,* 98 Misc.2d 148, 413 N.Y.S.2d 582 (1979).

## DISCUSSION: SUPPORTING EX PARTE COMMUNICATIONS

Since we conclude that the existence of an implied qualified waiver did not entitle

---

4. Section 12–2235 reads:

"In a civil action a physician or surgeon shall not, without the consent of his patient, or the conservator or guardian of the patient, be examined as to any communication made by his patient with reference to any physical or mental disease or disorder or supposed physical or mental disease or disorder or as to any such knowledge obtained by personal examination of the patient."

5. In this case, the patient is a minor child, therefore, his parents, as legal guardians, are the holders of the privilege.

6. Section 12–2236 reads:

"A person who offers himself as a witness and voluntarily testifies with reference to the communications referred to in §§ 12–2234 and 12–2235 thereby consents to the examination of such attorney, physician or surgeon."

defense counsel to engage in *ex parte* communications with plaintiff's treating physicians, we proceed to address the numerous remaining arguments and public policy considerations raised in the parties' respective briefs. We consider petitioners' next contention that Arizona case law has recognized *ex parte* communications as an appropriate method of trial preparation. In support of their argument, petitioners cite *Longs Drug Stores v. Howe*, 134 Ariz. 424, 657 P.2d 412 (1983), for the proposition that "informal interviews are an appropriate method of trial preparation." The *Longs* case is inapposite to the present case. *Longs* was an action for wrongful termination of employment in which the plaintiffs sought production of statements of defendant's employees taken by an insurance investigator on behalf of defendant, as well as reports prepared by the investigator. *Id.* at 426, 657 P.2d at 414. The *Longs* case was not a medical malpractice action, the statements at issue in that case were not made by a plaintiff's treating physician to defense attorneys, and the nature of the *ex parte* contact was substantially different from that in the present case. We therefore conclude that the *Longs* case is inapplicable.

Our review of relevant case law, as previously noted, discloses that there are no Arizona cases on point. Therefore, we consider the case law cited by petitioners in support of their contention that *ex parte* communications are proper and the cases cited by the real parties in interest and *amicus* in opposition. Before doing so we point out, in a summary manner, the judicial rationale which has been expressed in support of and in opposition to such *ex parte* interviews. Those courts which have taken the view that a defendant's counsel may interview the plaintiff's treating physicians *ex parte* have identified a number of factors and policies for allowing such informal methods of discovery. These include decreased litigation costs, the potential to eliminate non-essential witnesses, early evaluation and settlement of claims, the ease of scheduling interviews as opposed to depositions, and greater spontaneity and candor in the interview than in the deposition. Annot., *supra*, at 717.

Those courts which have taken an opposite view and have held that the defendant's counsel is limited to the formal methods of discovery listed within the Rules of Civil Procedure have based their decisions on varying propositions. Among the reasons relied upon in refusing to grant permission for informal *ex parte* interviews are the broad privacy interest underlying the physician-patient relationship, the potential tort liability of physicians for breach or invasion of privacy, the potential that defense counsel may seek to improperly influence plaintiff's treating physicians or may discourage the physician from testifying, the duty of loyalty from the physician to the patient, and the view that discovery rules determine the extent of the physician-patient privilege. Annot., *supra*, at 719–20.

Of the cases cited by petitioners in support of *ex parte* interviews, the case of *Doe v. Eli Lilly & Co., Inc.*, 99 F.R.D. 126 (D.D.C.1983), is representative. In that case, the federal district court for the District of Columbia acknowledged the existence of a statutory physician-patient privilege and that there had been a limited waiver of the privilege by placing the plaintiff's physical and mental condition in issue. However, notwithstanding only a limited waiver, the court granted the motion to compel discovery filed by the defense attorneys who wished to engage in informal as well as formal contact with plaintiffs' treating physicians. In so ruling, the court concluded that "... it would be an abuse of the privilege to allow it to be used in such a manner which has no relation to the purposes for which it exists." *Id.* at 129. The court discussed several considerations in support of its conclusion.

First, the court pointed out that no party has a proprietary right to any witness' evidence, and therefore, may not restrict his opponent's access to a witness. *Id.* at 128. We note, however, in this regard, that a ban on *ex parte* communications does not preclude defense attorneys from contacting plaintiff's treating physicians.

Rather, such a ruling merely limits the methods of contact available to the defense attorney to those methods authorized by our Rules of Civil Procedure.

The district court also pointed out that the formal methods of acquiring evidence listed in the Rules of Civil Procedure have never been thought to be exhaustive, so as to thereby preclude use of informal methods such as *ex parte* communications. *Id.* We agree with this observation as a general proposition. However, we believe that the facts of this case, namely, that the witnesses in question are the plaintiff's treating physicians, along with the specific applicable statute, A.R.S. § 12–2235, removes this case from the application of the general proposition.

The *Eli Lilly* court further reasoned that the potential for influencing trial testimony is inherent in every contact with a potential witness regardless of whether that contact is a formal one authorized by the Rules of Civil Procedure or an informal one such as an *ex parte* interview. *Id.* Although it is true that any discovery device is subject to abuse, realistically, we believe that the presence of the plaintiff's attorney at an interview between plaintiff's treating physicians and defense attorneys will substantially reduce the potential for abuse.

The district court in *Eli Lilly* also reasoned that the availability of sanctions for abuse of the *ex parte* communications procedure justifies its implementation in the medical malpractice context. *Id.* We believe, however, that not all of the damage caused by improper *ex parte* communications can be rectified through imposition of sanctions. Specifically, we believe that the physician-patient relationship might be irreparably injured as a result of an *ex parte* communication between the physician and the patient's legal opponent. This type of damage can neither be mitigated nor alleviated by legal sanctions.

The district court in *Eli Lilly* also believed that an invocation of the physician-patient privilege so as to preclude *ex parte*

communications gives the holder of the privilege an unfair advantage in litigation inasmuch as the defendant is not given the same access to the physician witness as is the plaintiff. *Id.* Again, however, we believe that the unique nature of the physician-patient relationship justifies a ban on *ex parte* communications. We recognize that such a ban allows the plaintiff to engage in *ex parte* communications with his physician witnesses while it prohibits the defendant from gaining equal access. However, this inequality of access to the physician witnesses does not preclude the defendant from availing himself of the full panoply of discovery devices provided by the Rules of Civil Procedure.

Finally, the *Eli Lilly* court listed a series of practical considerations in support of its holding in favor of *ex parte* communications. Specifically, the court noted that *ex parte* interviews are less costly than formal discovery methods; *ex parte* communications are typically easier to schedule than are depositions; *ex parte* communications produce greater candor and spontaneity on the part of the witness; and *ex parte* communications tend to eliminate non-essential witnesses in a cost-efficient manner. *Id.* Although we agree that these practical advantages may be inherent in an informal procedure such as an *ex parte* interview, we do not believe that such practical concerns as cost efficiency and ease of scheduling are of paramount concern to a proper resolution of the issue.

After considering *Eli Lilly* and reviewing cases cited by petitioners in support of their contention that *ex parte* communications should be permitted,[7] we are not persuaded that such a position should be adopted in Arizona. Rather, we believe that the countervailing arguments which we shall address shortly justify a ban on such *ex parte* communications.

Petitioners finally contend that Ethics Opinion No. 78–23 issued by the Arizona State Bar Ethics Committee authorizes *ex parte* communications. That opinion es-

---

7. *Langdon v. Champion,* 745 P.2d 1371 (Alaska 1987); *Trans–World Investments v. Drobny,* 554 P.2d 1148 (Alaska 1976); *Coralluzzo By And* *Through Coralluzzo v. Fass,* 450 So.2d 858 (Fla. 1984); *Lazorick v. Brown,* 195 N.J.Super. 444, 480 A.2d 223 (1984).

sentially states that an attorney may ethically engage in *ex parte* communications with plaintiff's treating physicians so long as he does not deliberately induce a breach of the physican-patient privilege. However, Ethics Opinion No. 88–01, a more recent opinion by the same committee, concludes that a lawyer may *not* ethically conduct an *ex parte* interview with an expert witness designated by opposing counsel for use at trial. At most, these ethics opinions arguably suggest that the propriety of *ex parte* communications requires judicial resolution. *See* fn. 2, *supra.*

## DISCUSSION: OPPOSING EX PARTE COMMUNICATIONS

Having discussed and rejected the contentions raised by petitioners in support of *ex parte* communications, we proceed to address what we feel are overriding public policy considerations which, when considered in conjunction with our statutory physician-patient privilege, justify a prohibition on *ex parte* communications between a plaintiff's treating physicians and defense attorneys. Our initial consideration involves the unique nature of the physician-patient relationship. That relationship is, first and foremost, a confidential one. *See* M. Udall, *Arizona Law of Evidence* § 93, at 145 (1960). Thus, our legislature perceived a need to protect the confidential nature of the relationship by enactment of a statutory physician-patient privilege. *See* A.R.S. § 12–2235 (1982). The purpose of the physician-patient privilege is to ensure that "the patient will receive the best medical treatment by encouraging full and frank disclosure of medical history and symptoms by a patient to his doctor." *Lewin v. Jackson*, 108 Ariz. 27, 31, 492 P.2d 406, 410 (1972). We believe the public has a widespread belief that information given to a physician in confidence will not be disclosed to third parties absent legal compulsion, and we further believe that the public has a right to have this expectation realized. *See Humphers v. First Interstate Bank*, 68 Or.App. 573, 579, 684 P.2d 581, 587 (1984), *aff'd in part, rev'd in part*, 298 Or. 706, 696 P.2d 527 (1985).

Arizona also recognizes that there is a fiduciary relationship between the physician and patient which requires the physician "to exercise the utmost good faith." *Hales v. Pittman*, 118 Ariz. 305, 308, 576 P.2d 493, 496 (1978). The physician's fiduciary duty requires that he act in the best interests of his patient so as to protect the sanctity of the physician-patient relationship while, at the same time, complying with court authorized discovery. *See Petrillo v. Syntex Laboratories, Inc.*, 148 Ill.App.3d 581, 591–96, 102 Ill.Dec. 172, 179–82, 499 N.E.2d 952, 959–62 (1986), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987). We agree with the *Petrillo* court when, in limiting physician disclosure to court authorized methods of discovery, it stated:

> Discussion of the patient's confidences under any other circumstances, such as the *ex parte* conference, could be inconsistent with the duties of a fiduciary for the physician would, in effect, engage in conduct which may be contrary to a fiduciary's obligation of good faith and, in addition, may be potentially harmful to the interests of the patient in that the physician might disclose intimate facts of the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit. Consequently, the *ex parte* conference involves conduct which could be violative of the duties of a fiduciary and would, therefore, be contrary to the public policy favoring the fiduciary nature of the physician-patient relationship.

*Id.* at 595, 102 Ill.Dec. at 181–82, 499 N.E.2d at 961–62. We believe that *ex parte* communications between defense attorneys and plaintiffs' treating physicians would be destructive of both the confidential and fiduciary natures of the physician-patient relationship which have been recognized by statutory and case law.

A second set of considerations supporting a prohibition on *ex parte* communications involves the pressure brought to bear on the physician when he or she is faced with a request for an *ex parte* interview by a defense attorney. Although the physi-

cian is free to reject such a request and thereby force the defense attorney to utilize formal methods of discovery, we believe that this option does not acceptably reduce the pressure on the physician. A physician may lack an understanding of the legal distinction between an informal method of discovery such as an *ex parte* interview, and formal methods of discovery such as depositions and interrogaties, and may therefore feel compelled to participate in the *ex parte* interview. We also note that in Arizona, a substantial number of physicians are insured by a single "doctor owned" insurer. Realistically, this factor could have an impact on the physician's decision. In other words, the physician witness might feel compelled to participate in the *ex parte* interview because the insurer defending the medical malpractice defendant may also insure the physician witness.

An additional factor that must be taken into consideration is that a physician who allows himself to be interviewed *ex parte* embarks, perhaps unknowingly, on a course which may involve a breach of professional ethics and potential liability. First, participation in an *ex parte* interview may constitute a breach of the physician's professional code of ethics.[8] The Hippocratic Oath[9] acknowledges the physician's obligation to keep in trust patient confidences. Further, Principle IV of the American Medical Association's Principles of Medical Ethics requires physicians to "safeguard patient confidences within the constraints of the law." Finally, Section 5.05 of the Current Opinions of the Judicial Council of the American Medical Association states that "[t]he information disclosed to a physician during the course of the relationship between physician and patient is confidential to the greatest possible degree." It would therefore appear that a physician's ethical obligations preponderate

against his participation in *ex parte* interviews.

Second, a physician's disclosure of confidential information during an *ex parte* interview may subject the physician to charges of professional misconduct. A.R.S. § 32–1401.12(b) defines unprofessional conduct for the medical profession to include "[i]ntentional betrayal of a professional secret or intentional violation of a privileged communication except as either act may otherwise be required by law." A.R.S. § 13–1401.12(b) (Supp.1988). Thus, the physician's voluntary participation in the *ex parte* interview may subject him or her to professional discipline as well as potential tort liability.

Third, at least in the present case, the physician's participation in a non-consensual *ex parte* interview would not be in accord with the voluntary Guidelines for Cooperation Between Physicians and Attorneys in Maricopa County adopted jointly by the Maricopa County Bar Association and the Maricopa County Medical Society. Section IV(B) of the Guidelines specifically states that if a lawyer representing the defendant wishes to discuss the case with a treating physician, he should either present that physician with a signed release of medical information authorization or subpoena the physician for deposition. In this case, there was no compliance with Guideline IV(B).[10]

An additional consideration supporting a ban on *ex parte* interviews involves the practical difficulty in determining the scope of the waiver of the physician-patient privilege. The scope of the waiver is often in dispute, and absent court participation in the discovery process, resolution of that dispute is left to the defense attorney and the physician witness. We believe that this scenario places both the defense attorney and the physician in an untenable position.

---

**8.** The code of ethics for the medical profession is comprised of three prongs: 1) the Hippocratic Oath; 2) the American Medical Association's Principles of Medical Ethics; and 3) the Current Opinions of the Judicial Counsel of the American Medical Association. *See Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 586, 102 Ill.Dec. 172, 177, 499 N.E.2d 952, 957 (1986).

**9.** The Hippocratic Oath states:
"Whatever, in connection with my professional practice or not in connection with it, I see or hear, in the life of men, which ought not to be spoken abroad, I will not divulge, as reckoning that all such should be kept secret."

**10.** We acknowledge that the Guidelines do not have the effect of a rule.

As the Iowa Supreme Court stated in *Roosevelt Hotel Ltd. Partnership v. Sweeney*, 394 N.W.2d 353, 357 (1986):

> Placing the burden of determining relevancy on an attorney, who does not know the nature of the confidential disclosure about to be elicited, is risky. Asking the physician, untrained in the law, to assume this burden is a greater gamble and is unfair to the physician. We believe this determination is better made in a setting in which counsel for each party is present and the court is available to settle disputes.

We believe that resolution of any dispute over the scope of the waiver of the physician-patient privilege should be made in an adversarial as opposed to an *ex parte* setting.

### CONCLUSION

■ Upon review of the numerous countervailing public policy considerations presented on the issue in this case, we conclude that the advantages to be gained in the informal *ex parte* procedure are clearly outweighed by the dangers that procedure presents to the physician-patient relationship as well as by the pressures the procedure brings to bear on the physician and attorney participants. We agree wholeheartedly with the Supreme Court of Washington when it stated that "[t]he unique nature of the physician-patient relationship and the dangers which *ex parte* interviews pose justify the direct involvement of counsel in any contact between defense counsel and a plaintiff's physician." *Loudon v. Mhyre*, 110 Wash.2d 675, 681, 756 P.2d 138, 142 (1988). Accordingly, based upon the provisions of A.R.S. § 12–2235 and public policy, we hold that defense counsel in a medical malpractice action may not engage in non-consensual *ex parte* communications with plaintiff's treating physicians.

### APPROPRIATENESS OF SANCTIONS

We now consider the sanction imposed by the trial court. The trial judge's order barred plaintiff's treating physicians from testifying as experts on behalf of petitioners unless they were first offered as witnesses by plaintiffs. Prior to today's decision, the law on this issue in the State of Arizona was unsettled. There was no definitive decision and there was considerable room for argument on both sides of the issue. Given this situation, we believe that it was an abuse of discretion for the trial court to summarily impose the sanction of preclusion of testimony.

We remand this matter to the trial court with directions to vacate its ordered sanction. If the plaintiffs believe that the defendants, through the *ex parte* interviews, secured information that they could not have obtained by formal discovery, they may request an evidentiary hearing. If the trial court finds that the defendants did secure such information, it may fashion an appropriate remedy to preclude its use or exploitation.

Remanded.

KLEINSCHMIDT, Judge, concurs.

BROOKS, Presiding Judge, specially concurring:

I do not disagree with the majority's analysis and balancing of the various policy considerations that are brought into play when informal methods of discovery are pursued in a medical malpractice action. However, I would end the inquiry and dispose of this special action without announcing a rule by judicial fiat, leaving that matter within the rule-making power of our supreme court. *See* Ariz. Const. art. 6, § 5(5). That court would then have the benefit of the input contemplated by A.R.S. § 12–110.[1]

---

1. A.R.S. § 12–110 provides:

   A. The state bar, or a representative group selected by the bar, shall act as an advisory board and shall either voluntarily or upon request of a majority of the judges of the supreme court, consult with, recommend to or advise the court on any matter dealt with or proposed to be dealt with in the rules.

   B. Any member of the state bar or a private citizen may object in writing to a rule or part thereof and may request changes. The court shall consider the objections and re-

· in the case at hand, it is sufficient to hold that since no Arizona statute or rule currently prohibits defense counsel from engaging in *ex parte* conferences with the plaintiff's treating physicians, no sanctions should have been imposed on petitioners' counsel at this stage of the proceedings. However, as pointed out in the majority opinion, should it later appear that the *ex parte* discussions resulted in the disclosure of information that could not have been obtained through formal discovery, appropriate sanctions could be considered.

quests as advice and information only and

may act thereon at its discretion.