William **HARLAN** and Genice Harlan, Individually and as Parents and Natural Guardians of Danielle Harlan, A Minor, Plaintiffs,

v.

James S. **LEWIS**, M.D., Defendant.

No. LR–C–91–244.

United States District Court, E.D. Arkansas, W.D.

Jan. 29, 1992.

Calvin J. Hall and Laura Hensley Smith, Little Rock, Ark., for defendant.

Charles Phillip Boyd, Little Rock, Ark., for plaintiffs.

## MEMORANDUM OPINION AND ORDER

HENRY WOODS, District Judge.

The Court is troubled by the lack of civility among attorneys which has become all too common. The erosion of cooperation and courtesy within the legal community accounts, in large part, for the negative image attorneys suffer in the community at large.

Moreover, constant squabbling increases the cost of litigation for all parties and causes unnecessary delay in the resolution of disputes between citizens. Reduction of the cost of litigation and the elimination of unnecessary delay have recently been the focus of concern in this district and across the nation. At the direction of Congress, task forces across the nation have studied ways and means of increasing efficiency and reducing waste of time and money in the federal courts. In the Eastern District of Arkansas, an Advisory Committee of local attorneys, court staff and private citizens volunteered countless hours studying the causes of unreasonable litigation costs and delay in this district and recommending solutions. Their findings and conclusions, which appear in a comprehensive report,[1] recommend the continued imposition of sanctions "as needed to control litigation abuses, but only as needed for that purpose."[2]

The case at hand is a garden variety lawsuit, unremarkable except for the enmity between counsel. Plaintiffs' counsel has, in disregard of Local Rule 13(a), included the Court on the mailing list for much, if not all, of the attorney bickering conducted via correspondence. On the other hand, the conduct of the defendant's

---

1. *See* Shults, Chair, *Report of the Advisory Group for the United States District Court for the Eastern District of Arkansas Under the Civil Justice Reform Act of 1990* ("Advisory Report").

2. *Id.* Advisory Report Recommendation No. 12.

counsel in this case has gone beyond discourteous and crossed into the zone of impermissible and unethical conduct. For reasons explained more fully below, abuses in this case justify and require sanctions.

## I. Background

This case involves allegations of permanent damages to an infant, Danielle Harlan, allegedly due to the failure of the defendant physician, James S. Lewis, to check the results of a mandatory blood screen for a condition known as hypothyroidism. According to the plaintiffs' allegations, hypothyroidism, if detected and treated soon after birth, results in no long-term damage to a child. If left undetected and untreated it can lead to irreversible mental retardation.[3]

The defendant, Dr. Lewis, was Danielle's pediatrician from birth through the first few months of her life. She was subsequently treated by several other physicians, none of whom are, or have been, defendants in this case. It does not appear from the pleadings now before the Court that either party contends that subsequent treating physicians were in any way to blame for the damages to Danielle Harlan.

The plaintiff has moved to prohibit the defendant's attorneys from contacting Danielle's non-party treating physicians and speaking with them *ex parte* (out of the presence of the plaintiffs' attorney) and "informally" (without the patient's authorization or consent).

## II. The Physician–Patient Relationship

At the heart of this dispute lies the physician/patient privilege and a patient's right to prevent or limit the broadcast of confidential communications made to their physicians in the course of the physician-patient relationship.

Most privileges which protect information from disclosure are based on the notion that full, open, honest communication within some relationships—for example between husband and wife, attorney and client, and physician and patient—is so important to the well-being of a civilized society that those communications must be protected from disclosure. The fostering of open and honest communication within those relationships is deemed to outweigh society's interest in obtaining information. Although some privileges, such as the peer review privilege[4] which Dr. Lewis has asserted in this case, are not based on special relationships, they nonetheless seek to foster open, frank, and honest communications by insuring that the information will not be revealed at a later time.

There were no privileges at common law. They arise, if at all, statutorily. Notwithstanding the fact that the common law never imposed a requirement upon them, physicians long ago recognized the crucial importance of confidentiality in the physician-patient relationship. For hundreds of years the medical profession has adhered to the wisdom of Hippocrates, recognizing an ethical obligation not to divulge information about patients.[5]

The purpose of both the statutory physician-patient privilege and the self-imposed ethical restraints observed by physicians in handling their patients' medical informa-

---

**3.** By briefly stating the plaintiffs' alleged cause of action, the Court in no way intends to comment on issues in dispute. The Court is aware that the defendant may contend, among other things, that Danielle Harlan's condition is not the result of lack of treatment after birth. The allegations are recited, in summary, for the sole purpose of explaining the issues involved in the current discovery disputes, the Court's rulings and the reasons therefor.

**4.** A.C.A. § 20–9–503 provides:
"The proceedings and records of a peer review committee ... shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are subject to evaluation and review by the committee...."

**5.** Section 5.05 of the Current Opinions of the Judicial Counsel of the American Medical Association states:
"Information disclosed to a physician during the course of a relationship between a physician and a patient is confidential to the greatest possible degree.... The physician should not reveal confidential communications or information without the *express consent* of the patient *unless required to do so by law.*" (Emphasis added.)

tion are evident. However, perhaps a summary is in order.

> The purpose of the physician-patient privilege is to enable the patient to secure complete and appropriate medical treatment by encouraging candid communications between patient and physician, free from fear of the possible embarrassment and invasion of privacy engendered by an unauthorized disclosure of information.

*State Ex Rel. Woytus v. Ryan,* 776 S.W.2d 389 (Mo.banc 1989). *See also, Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986).

The ethical obligation of physicians to protect and safeguard the confidences of their patients, absent legal compulsion to disclose, has not been lost on the public. While persons outside the legal profession may not understand all of the legal niceties of the privilege, there is a general public understanding that physicians will not disclose patient information unless and until they are legally compelled to do so.

> [T]he public has a wide-spread belief that information given to a physician in confidence will not be disclosed to third parties absent legal compulsion, and we further believe that the public has a right to have this expectation realized.

*Duquette v. Superior Court of County of Maricopa,* 161 Ariz. 269, 275, 778 P.2d 634, 640 (App.1989).

### III. The Physician–Patient Privilege in Arkansas

■ Although, generally speaking, state rules of evidence do not apply in federal court, questions involving privilege *are* governed by state law. Fed.R.Ev. 501.[6] Thus we turn to the law of the State of Arkansas in this diversity medical malprac-

6. Fed.R.Ev. 501 states in pertinent part: "[I]n civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law."

7. "Confidential communications" are defined in Rule 503(a)(5) of the Arkansas's Uniform Rules of Evidence:
   "A communication is 'confidential' if not intended to be disclosed to third persons, except per-

tice case to determine: (1) the scope of the statutory physician-patient privilege, and (2) the manner in which information which is no longer privileged may be discovered.

In Arkansas, the physician-patient privilege, set out in Rule 503 of the Uniform Rules of Evidence, A.C.A. § 16–41–101, grants a patient the privilege of preventing *"any other person* from disclosing confidential communications[7] made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition...." (emphasis added).

Pursuant to Rule 503(d)(3), a patient waives the privilege "as to a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense...." This limited waiver balances the need for confidentiality with the need for relevant information in a lawsuit.

The defendant contends that by filing a medical malpractice suit the plaintiffs generally, forever, and for all purposes waived any right to control release of confidential information confided to, or discovered by, any treating physician. "Having made public by the filing of this lawsuit that which was once confidential, the plaintiffs cannot be selective in the waiver of the privilege." (Defendant's Response to Motion to Prohibit *Ex Parte* Communications, p.19).

By recent amendments to its rules of evidence and its rules of civil procedure, Arkansas has explicitly adopted the better view. Rule 35 of the Arkansas Rules of Civil Procedure[8] has been amended to add a new subdivision:

> sons present to further the interest of the patient in the consultation, examination, or interview, persons reasonably necessary for the transmission of the communication, or persons who are participating in the diagnosis and treatment under the direction of the physician, psychotherapist, or chiropractor, including members of the patient's family."

8. The defendant argues that this Court should ignore the Rule 35 change because the Arkansas Rules of Civil Procedure do not apply in federal court. The argument is unpersuasive. As noted

(c) *Medical Records.* Where a party relies upon his physical, mental or emotional condition as an element of his claim or defense, he shall, upon the request of any other party, execute an authorization to allow such other party to obtain copies of his medical records; provided, however a party shall not be required, by order of court or otherwise, to authorize any communication with his physician or psychotherapist other than (1) the furnishing of medical records, and (2) communications in the context of formal discovery procedures....

The Reporter's Note accompanying Rule 35 was also amended to provide:

[Subdivision (c) ] makes plain that *a party may not be required to allow* an adversary to communicate with the party's physician or psychotherapist outside the formal discovery process. *This safeguard is deemed necessary to protect the confidential relationship between a party and his physician* or psychotherapist. (Emphasis added.)

Rule 503 of Arkansas's Uniform Rules of Evidence was amended simultaneously with Rule 35. Rule 503(d)(3) now reads, in pertinent part:

(3) ... There is no privilege under this rule as to medical records or communications relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense ...; provided, however, a patient shall not be required, by order of the court or otherwise, to authorize any communication with any physician or psychotherapist other than (A) the furnishing of medical records, and (B) communication in the context of formal discovery procedures.

Thus even though the privilege is partially waived through the filing of a lawsuit, Arkansas citizens retain some control over the *manner* in which information concerning their medical records and treatment is released. This places Arkansas among an enlightened "emerging consensus [of states adhering] to the position that defense counsel is limited to the formal methods of discovery enumerated by the jurisdiction's rules of civil procedure, absent the patient's express consent to counsel's *ex parte* contact with her treating physician." *Crist v. Moffatt,* 326 N.C. 326, 389 S.E.2d 41 (1990).

## IV. Public Policy Considerations

Public policy considerations favor the Arkansas view. It strikes an appropriate balance between the parties' ability to obtain all relevant information and the patient's right to have irrelevant medical information remain confidential. There is absolutely no relevant medical information which can be withheld under the Arkansas view. All relevant medical information is fully discoverable. The only hitch is that third parties must utilize formal discovery tools. Under a contrary view, physicians would be legally free to indulge in idle break-room gossip about all of their patients involved in any litigation where the patient's health is either a claim or defense.

Beyond protecting confidences which are not relevant to any issue in a lawsuit, the Arkansas view protects society's interest in safeguarding the "unique and confidential nature of the physician-patient relationship." *Crist,* 389 S.E.2d at 46. In sum, even though the physician-patient privilege is waived through the filing of a lawsuit, "the confidential nature of the physician-patient relationship remains, even though medical information is then subject to discovery." *Id.*

Other compelling public policy concerns are implicated. Informal *ex parte* interviews with attorneys representing interests adverse to their patients are unfair to treating physicians. Physicians unfamiliar with legal proceedings may be unaware of their right to refuse to participate in such interviews.

above, federal courts look to state law to determine what, in any, privilege applies. If nothing else, the amendments to ARCP 35 and to the Reporter's Note, vitiate the defendant's argument that the Supreme Court of Arkansas did not really mean what it said with the amendment to Rule 503 of the Uniform Rules of Evidence.

A physician may lack an understanding of the legal distinction between an informal method of discovery such as an *ex parte* interview, and formal methods of discovery such as deposition and interrogatories, and may therefore feel compelled to participate in the *ex parte* interview.

*Duquette,* 778 P.2d at 641.

Furthermore, unauthorized *ex parte* interviews force physicians to make legal—not medical—decisions affecting their patients and themselves. By filing a malpractice claim, patients waive the physician-patient privilege *only* as to those communications "relevant to an issue in [a] proceeding...."[9] How can a physician be expected to distinguish medical information which is "relevant to an issue"—and thus no longer privileged—from medical information which is important and interesting, but *irrelevant* to the issues in a lawsuit—information which is still privileged? Unauthorized *ex parte* interviews leave physicians in the undesirable position of making legal decisions without benefit of either (1) disinterested legal advice *or* (2) the presence of the attorney representing his or her patient's interest.

> The physician, largely unschooled in legal matters, cannot be expected to make the sometimes difficult determination of what matters are relevant to the plaintiff's claims. [Citation omitted] The participation of both parties' counsel in formal discovery will help to insure that these questions are resolved to the satisfaction of both parties or that more intractable problems are submitted to the trial court for its impartial determination.

*Nelson v. Lewis,* 130 N.H. 106, 534 A.2d 720, 723 (1987). Often physicians are not aware of the precarious legal position *ex parte* interviews place them in.

> Breaches of patient confidentiality, whether the result of inadvertence or pressure by the interviewer, may expose

the doctor to charges of professional misconduct or tort liability.

*Crist v. Moffatt,* 389 S.E.2d at 47.

*Ex parte* interviews between nonparty treating physicians and lawyers representing interests adverse to the patient open the door for improper or unethical conduct.

> An unauthorized *ex parte* interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating physician might be the next person to be sued, and other topics which might influence the treating physician's views. The potential for impropriety grows even larger when defense counsel represents the treating physician's own insurance carrier and when the doctor, who typically is not represented by his personal counsel at the meeting, is unaware that he may become subject to suit by revealing the plaintiff/patient's confidences which are not pertinent to the pending litigation.

*Crist v. Moffatt,* 389 S.E.2d at 47, quoting *Manion v. N.P.W. Medical Center, Inc.,* 676 F.Supp. 585, 594–95 (M.D.Pa.1987).

The record in this case underscores the misunderstanding arising from a situation where one law firm represents the malpractice carrier for virtually all physicians in the state. The record is replete with testimony of conversations between Mr. Hall, or another member of his firm, and nonparty physician witnesses in the case—both treating and nontreating. The potential for improper communication is magnified when the attorneys for the insurance carrier are permitted to engage treating physicians in casual conversation about their patients.

For example, Dr. C.E. Ransom, the physician who delivered Danielle Harlan, testified in his deposition about contacts by the defendant's attorney, Mr. Hall:

> Q (by plaintiffs' counsel): Have you ever met or discussed this matter with Mr. Hall prior to today?

9. Rule 503(d)(3), Arkansas Uniform Rules of Evidence.

A: ... [Mr. Hall] called and told me that he wanted to meet with me relative to a lawsuit that had been filed against Dr. Lewis concerning the Harlan baby. And then subsequently he came to the office.... The other time that I've talked to him about this, it was after you had come by wanting to talk to me about this case. Not knowing what you wanted to ask me or talk to me about, I—knowing that he [Mr. Hall] was St. Paul's [the malpractice insurance carrier's] lawyer, at least one of them, I called him and—to ask him for advice....

To Mr. Hall's credit, he referred Dr. Ransom to St. Paul without giving advice. Nonetheless, this testimony illustrates one danger identified by the *Manion* court:

> Furthermore, the unauthorized *ex parte* interview of a plaintiff's treating physician by defense counsel creates a situation which may invite questionable conduct. This court will not overlook the current concerns in the medical malpractice insurance industry and the attitudes of physicians and carriers alike.

*Manion*, 676 F.Supp. at 594.

In this case, Dr. Ransom agreed to talk with Mr. Hall—and in fact initiated one telephone conversation—but refused to talk informally with his own patient's attorney outside formal discovery. The fact is that physicians tend to consider St. Paul's attorneys *their* attorneys, even when they are not parties to the lawsuit. This tendency is aptly demonstrated by the fact that Dr. Ransom, a non-party treating physician telephoned Mr. Hall for his permission, or at least his advice, about talking with *his own patient's attorney.*

The Court does not ascribe evil motives or intent to physicians' assumption that their malpractice carrier's attorney is *their* attorney, but it buttresses the argument against permitting treating physicians to engage in unauthorized informal chitchat about their patients with their malpractice carrier's attorneys. Such conversations create an inherent conflict of loyalties for the physicians.

## V. Attorney Misconduct

In *Manion*, the district court emphasized the fact that there were no allegations or evidence of misconduct on the part of the defense attorney. Regrettably, that is not true in this case. We need look no further than the undisputed facts in this case for illustration of exactly the kind of misconduct to which the *Manion* court referred.

■ The plaintiffs have submitted sworn testimony indicating that one of the defendant's attorneys, Mr. C.J. Hall, made improper and unethical comments and suggestions in *ex parte* interviews. Dr. Edward L. McAdams's affidavit indicates that shortly after the Harlans filed suit, Dr. Lewis's attorney, Mr. Hall, visited Dr. McAdams.

> "C.J. Hall [Dr. Lewis's attorney] came up and met with me in Searcy, Arkansas. He told me that as a treating physician, I may be called as a witness at the trial of this matter or *could also be sued by the Harlans.*
>
> "*Mr. Hall also told me that if I did not testify for the Harlans, that the suit would probably not be successful.*"

Affidavit of Edward L. McAdams, M.D., Exhibit D to Plaintiffs' Reply to Response to Motion to Prohibit *Ex Parte* Communications (Emphasis added). By suggesting to Dr. McAdams that he not testify, the defendant's lawyer has violated Model Rules of Professional Conduct which prohibit a lawyer from obstructing another party's access to evidence *or* from counseling a third party to conceal information having "possible evidentiary value." Model Rule 3.4(a). Even if the Arkansas Rules permitted *ex parte* interviews, this conduct would be impermissible and unethical. Defense counsel's improper conduct illustrates graphically the wisdom of the prohibition against unauthorized *ex parte* communications with a patient's treating physician. C.J. Hall is hereby sanctioned $2500, an amount the Court considers paltry, in light of the conduct.

■ The defendant has recently designated treating physicians as "defense experts." The defendant will not be permitted to circumvent the clear intent of the

Arkansas rules relating to privilege by this disingenuous designation. The Court has seriously considered barring these treating physician/defense experts from testifying at all in light of defense counsel's blatant refusal to acknowledge, much less comply with, Rules 503 and 35 and his improper attempts to influence testimony. *See Karsten v. McCray*, 157 Ill.App.3d 1, 109 Ill. Dec. 364, 509 N.E.2d 1376 (2d Dist.1987) *app. den. Karsten v. McCray*, 117 Ill.2d 544, 115 Ill.Dec. 400, 517 N.E.2d 1086 (1987) ("We therefore further hold that barring the testimony of a plaintiff's treating physician is an appropriate sanction to protect the physician-patient privilege from defense interviews outside formal discovery.") However, such a sanction would effectively eviscerate Dr. Lewis's ability to present a defense. Therefore, the defendant will be permitted to elicit expert opinions from treating physicians, but defense counsel may not meet with treating physician "experts" outside the presence of the plaintiffs' attorney, unless the plaintiffs so authorize. Of course, plaintiffs' counsel will be permitted to cross-examine these "experts" about defense counsel's attempts to improperly influence their opinions. Furthermore, if the defendant intends to use treating physicians as expert witnesses, defense counsel must turn over to plaintiffs' counsel all notes, records, transcripts and recordings of *ex parte* interviews with those treating physicians which have occurred since April 1, 1991, the effective date of the amendment to Rule 503.

The defendant makes two arguments that merit comment. First, he advances the argument that the new Arkansas rule prohibiting unauthorized *ex parte* contact was "adopted by the Supreme Court pursuant to a concerted effort by the plaintiffs' bar." (Defendant's Response to Plaintiff's Motion to Prohibit *Ex Parte* communications, at p.9). Assuming the defendant's assertion to be true, the Court is at a loss to understand what it has to do with the applicability of the rule to defense counsel. The implication that attorneys are bound

only by those court rules they like—the rules their "side of the bar" endorsed—is not only novel, it is astonishing.

Second, the defendant argues that Rule 503(d)(3) does not mean what it appears to mean. The defendant argues that Rule 503(d)(3) merely means that patients cannot be forced to authorize defense lawyers to interview treating physicians *ex parte*, but that if the patients assert that right, defense lawyers are free to proceed with such contacts anyway. According to the defendant, in order to prevent unauthorized *ex parte* contacts, the Supreme Court should have stated: "A defense attorney shall not interview or contact *ex parte* any treating physician of the plaintiff." Of course, the obvious reason the Supreme Court did not phrase the amendment to Rule 503 as the defendant suggests is that defense counsel may indeed interview treating physicians *ex parte*—but *not without the patient's authorization*. The Reporter's Note to Rule 35 leaves no doubt that the intent of the Supreme Court in making the rule changes was to "safeguard .. the confidential relationship between *a party* and his physician...." Rule 35, ARCP (emphasis added).

■ One other serious matter must be addressed. The parties deposed Dr. James H. Golleher, who held a supervisory position over the hospital laboratory which, presumably, handled Danielle's blood sample and test results.[10] Dr. Golleher's deposition indicates that defendant's attorney, C.J. Hall, requested that Dr. Golleher not talk with plaintiffs' attorney:

Q (by plaintiffs' attorney): And during that conversation [with Mr. Hall], you told Mr. Hall that I had requested to speak to you informally and you had no objection to that. You told him that, didn't you?

A: Yes.

Q: And *Mr. Hall at that time indicated that he did have an objection to*

---

**10.** Dr. Golleher may be brought in as a defendant in this case. However, at the time of his deposition he indicated that he was an employee

of AMI Central Arkansas General Hospital, thus immune from suit by terms of the settlement between the plaintiffs and the hospital.

*you [sic] speaking to me informally,* didn't he?

A: If I remember right.

(Deposition of James H. Golleher, M.D., Exhibit A, Plaintiffs' Motion to Prohibit *Ex Parte* Communications).

Rule 3.4(f) of Model Rules of Professional Conduct plainly states:

A lawyer shall not ... request a person other than a client refrain from voluntarily giving relevant information to another party....

Dr. Golleher was not Mr. Hall's client, and his request/suggestion was unethical.

The question for the Court is the appropriate sanction. Plaintiffs have submitted a recent order entered in a state malpractice action wherein Mr. Hall's partner was ordered to write a letter of retraction to a physician/witness whom he had instructed not to cooperate with a plaintiff's lawyer. Such a remedial measure would be ineffective at this point in this lawsuit. Yet the Court cannot ignore this serious violation of ethical rules.

Mr. Hall is hereby sanctioned in the amount of $2500 for this violation. Plaintiffs' motion to recover costs of deposing Dr. Golleher on the ground that the deposition was necessitated by defense counsel's misconduct is denied. In the context of a medical malpractice lawsuit, it is naive to suggest that information from a physician with knowledge of the case would be discovered only through informal interviews. Even if Dr. Golleher had talked with plaintiffs' counsel, that would not have obviated the taking of his deposition.

The plaintiffs have moved to continue the case in order to add an additional defendant. The motion is granted. The parties will necessarily resume discovery in this case. The Court is aware that the modest sanctions imposed against Mr. Hall will not "unring the bell"; it is difficult for a court to sanction impermissible attorney conduct without unduly penalizing the client. However, Dr. Lewis should not misinterpret the Court's leniency. The sanctions imposed are intended to serve as a shot across the bow. Dr. Lewis, as well as all other parties and potential parties, are cautioned that any future misconduct by attorneys will result in substantial sanctions which will impact heavily upon the parties they represent.

Accordingly, the plaintiffs' Motion to Prohibit Unauthorized *Ex Parte* Communications with Treating Physicians is granted; the plaintiffs' Motion for Continuance is granted; the plaintiffs' and defendant's Motions to Exclude Witnesses who were untimely identified are moot in light of the continuance; the plaintiffs' Motion to Strike the Answer of a person not yet a party is denied as premature. All other pending motions are moot, except the plaintiffs' motions to compel discovery. Those motions will be taken up in a separate order.