**Eula Faye KING, Eddie Dewayne King, and Nancy Marie King, as the Heirs at Law of Franklin J. King, Jr., Deceased, Plaintiffs,**

v.

**Robert AHRENS, M.D., Individually and d/b/a the Ahrens Clinic, and Richard Ahrens, M.D., Individually and d/b/a the Ahrens Clinic, a Partnership, Defendants.**

**Civ. No. 91–3088.**

United States District Court,
W.D. Arkansas,
Harrison Division.

July 7, 1992.

Charles P. Boyd, Jr., Davidson Law Firm, Ltd., Little Rock, Ark., for plaintiffs.

Walter B. Cox, Davix, Cox & Wright, Fayetteville, Ark., for defendants.

## AMENDED MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiffs, Eula King, Eddie King, and Nancy King, instituted this action on September 12, 1991, seeking to hold the defendants liable for the alleged medical malpractice of Dr. Robert Ahrens. As filed, the complaint alleges two causes of action: one under state law for medical malpractice and one for "patient dumping" under 42 U.S.C. § 1395dd. This action is the refiling of an action originally filed on January 9, 1990, in the Marion County Circuit Court. The state court case had been set for trial in February of 1991 but was postponed at the last minute. On May 1, 1991, the state court action was dismissed. Thereafter, the case was refiled in this court.

For background purposes, the factual allegations of the complaint will be briefly summarized are as follows.[1] On April 27, 1989, Mr. Franklin King, Jr., went to the Ahrens Clinic in Yellville, Arkansas. Mr. King complained of pressure pain in the center of his chest which radiated down both arms and ascended up to and through his neck and jaws. Two electrocardiograms (EKG's) were performed. Dr. Ahrens reportedly determined that the EKG's were normal. Mr. King was then given a nubain shot and sent home. Plaintiffs contend Mr. King was in an unstable condition when sent home and had not been given proper care or treatment.

On April 29, 1989, Mr. King went into cardiac arrest at his home. Mr. King was transported to Baxter General Hospital in Mountain Home, Arkansas, where he was proclaimed dead on arrival. The complaint further alleges that an autopsy was performed which indicated that Mr. King had suffered a myocardial infarct on April 27, 1989. This myocardial infarct ultimately led to Mr. King's demise.

This matter is currently before the court on plaintiffs' motion to prohibit communications by defendants' counsel with medical care providers outside the presence of the plaintiffs' attorney. Plaintiffs contend that such *ex parte* communications are in violation of Rule 35 of the Arkansas Rules of Civil Procedure and Rule 503 of the Arkansas Rules of Evidence. According to plaintiffs, the July 1, 1991, amendments to these state law provisions prohibit *ex parte* communications with medical professionals unless the patient or plaintiffs have expressly authorized such communications. Plaintiffs request an order expressly prohibiting any *ex parte* communications between the attorneys for the defendants and any medical/health care provider who has treated

---

1. By briefly stating the plaintiffs' alleged causes of action, the court in no way intends to comment on the issues in dispute.

the deceased plaintiff or examined the deceased plaintiff.

## I. THE ISSUE

Plaintiffs motion is based on the recent amendments mentioned *supra,* the history leading to the amendments to Rule 35 and Rule 503, prior Arkansas law, a ruling from the Honorable Judge Henry Woods, United States District Judge for the Eastern District of Arkansas, *Harlan v. Lewis,* 141 F.R.D. 107 (E.D.Ark.1992), and rulings from other jurisdictions specifically prohibiting *ex parte* communications with treating physicians. Defendants vigorously oppose the motion. Defendants argue that plaintiffs' request is without merit or precedent in the law of Arkansas.

The issue of whether opposing counsel in conducting discovery in medical malpractice cases may interview or otherwise informally contact the injured party's treating physicians or is limited to formal discovery methods such as depositions has been the subject of numerous reported cases at both the federal and state level. It appears that there is no easy answer to this question and a variety of rules have developed. *See generally* Daniel P. Jones, Annotation, *Discovery: Right to Ex Parte Interview with Injured Party's Treating Physician,* 50 A.L.R.4th 714 (1986 and Sept. 1991 Supp.), and John L. Ropiequet, *Ex Parte Contacts and the Physician–Patient Privilege,* For the Defense, August 1989, at 25.

## II. THE THEORY AND CASES SUPPORTING PROHIBITION

Cases supporting the prohibition of *ex parte* communications exhibit concern for the existence of public policy considerations protecting the confidential nature of the physician-patient relationship, the physician's fiduciary relationship, preserving the physician's fiduciary responsibilities in the litigation process, and protecting the physicians from having to make legal determinations regarding the relevancy of the communication to the legal issues involved in the suit. *See e.g., Harlan v. Lewis,* 141 F.R.D. 107 (E.D.Ark.1992); *Manion v.*

*N.P.W. Medical Center, Inc.,* 676 F.Supp. 585 (M.D.Pa.1987).

The cases advance various considerations. First, it is pointed out that the rules authorize depositions of treating physicians. Thus, the prohibition on *ex parte* communications only requires resort to the formal discovery rules and does not prohibit discovery. Second, it is argued that *ex parte* discussions tend to place the physician in the position of having to make legal conclusions about the scope of the privilege and the relevancy of the material requested. In the informal setting the physician is without the aid of counsel and must make these types of decisions for himself. In such a situation, courts have voiced the concern that the physician may unknowingly breach his professional ethics requirements and subject himself to potential liability. Third, courts have expressed some concern that the allowance of informal discovery may jeopardize the confidential nature of the relationship between the physician and patient. It has been suggested that a patient could be inhibited from full and frank disclosure by the thought that his physician might at some future date be involved in informal communications with defense counsel. Fourth, the physician might feel compelled to participate in an *ex parte* communication. It is not uncommon for the insurer defending the medical malpractice defendant to also insure the physician witness. *See e.g., Duquette v. Superior Court of County of Maricopa,* 161 Ariz. 269, 778 P.2d 634 (App.1989).

## III. THE OPPOSITE VIEW

Courts taking the opposite view, refusing to prohibit *ex parte* communications, have focused on other factors. First, the courts have identified a number of factors that favor allowing informal methods of discovery including decreased litigation costs, the potential elimination of non-essential witnesses, early evaluation and settlement of claims, ease of scheduling, and greater spontaneity and candor in the interview. *See e.g., Doe v. Eli Lilly & Co.,* 99 F.R.D. 126 (D.D.C.1983). Along with this encouragement of informal discovery is the fact that generally no party has a proprietary

right to any witness' evidence and therefore may not ordinarily restrict another party's access to that evidence. *Id.* Second, it is thought that the physician-patient privilege is already adequately protected under the law and by the physicians ability to merely decline to participate in an *ex parte* interview. *See e.g., Felder v. Wyman,* 139 F.R.D. 85, 89 (D.S.C.1991). Third, it has been noted that the availability of sanctions for abuse of the *ex parte* communications procedure protects the patient. Fourth, the prohibition on informal discovery tends to give the plaintiff an unfair advantage in being able to "control" discovery. In this regard, the court in *Doe v. Eli Lilly & Co.* noted:

> The privilege was never intended, however, to be used as a trial tactic by which a party entitled to invoke it may control to his advantage the timing and circumstances of the release of information he must inevitably see revealed at some time.
>
> The inchoate threat implicit in refusing or qualifying permission to speak to a witness in possession of privileged information operates to intimidate the witness, who is then placed in the position of withholding or divulging what he knows at his peril, and is itself a species of improper influence. It also enables a party so wielding the privilege to monitor his adversary's progress in preparing his case by his presence on each occasion such information is revealed while his own preparation is under no such scrutiny.

*Eli Lilly,* 99 F.R.D. at 128–29.

## IV. DISCUSSION AND RULING

Many of the reported decisions deal with the particular language contained in statutes enacted to protect the physician-patient privilege and as a consequence are of little help in determining the correct rule of law for Arkansas. In others, the state courts have found that their statutory enactments in conjunction with overriding public policy considerations compel prohibition of such *ex parte* communications. *See e.g., Duquette v. Superior Court of County of Maricopa,* 161 Ariz. 269, 778 P.2d 634 (1989).

Federal Rule of Evidence 501 requires federal courts to determine issues of privilege in accordance with the law of the state that supplies the rule of decision. Thus, clearly, this court is bound to apply Arkansas law if the issue before the court is one of the application of physician-patient privilege as it probably is.[2]

The precise issue before the court does not appear to have been addressed by the Arkansas Court of Appeals or the Arkansas Supreme Court. In *Duncan v. Cole,* 302 Ark. 60, 786 S.W.2d 587 (1990), cited by the plaintiffs, the court merely held that a petition for a writ of prohibition was not the proper vehicle to challenge a trial court order prohibiting any contact by the attorneys for the petitioner with the plaintiff's treating physicians without the attorneys for the plaintiff being present. The court is so ruling expressed no opinion on the underlying issue regarding *ex parte* communications. *Id.* at 62, 786 S.W.2d 587.

Plaintiffs also refer the court to *Goodwin v. Harrison,* 300 Ark. 474, 780 S.W.2d 518 (1989). We do not believe the *Goodwin* case supports plaintiffs' proposition that *ex parte* communications are prohibited under Arkansas law. The *Goodwin* case dealt with a different issue entirely—whether a physician who formerly treated the plaintiff could testify as an expert witness for the defense. The court held that "a plaintiff's former treating physician may give his expert opinion for a defendant doctor in a medical malpractice action, so long as the physician-patient privilege is not breached." *Id.* at 483, 780 S.W.2d 518. In that case the plaintiff had cited cases dealing with the issue currently before this court and the Arkansas Supreme Court noted the difference in the issues and expressed no opinion with regard to whether it is proper

---

**2.** The court believes that an argument could be made that the question of whether a trial court can or should, in effect, enjoin a party and counsel from talking with witnesses, including physician witnesses, is not technically a question of privilege to which Arkansas law applies. However, for purposes of this opinion, the court will assume that Arkansas law applies.

for defense counsel to have *ex parte* communications with a plaintiff's treating physicians. *Id.* at 484, 780 S.W.2d 518.

Thus this court believes that it is its duty and function to read and attempt to understand applicable Arkansas law and apply it without a great deal of concern about what the writer of this opinion believes ought to be the law. In this regard, in the court's view, most of the cases discussed and cited in sections II and III of this opinion seem to exhibit an attempt by the writers of the opinions to determine what the "best" rule is or what the law ought to be. Many of these cases discuss, sometimes at considerable length, public policy considerations and why the particular view being espoused is better than the opposite view. This court does not believe that is its "job". Instead, that is the "job" of the duly elected legislature. Thus, this court does not believe that its function is to determine all that is good and, by its rulings, make certain that others agree or at least follow, even if the court felt that it could unerringly make that determination.[3]

The court will now discuss its view of what the state of the law in Arkansas on this issue presently is and will attempt to apply it. In doing this, it is perhaps helpful to discuss the development of the physician-patient privilege in Arkansas. As Judge Henry Woods pointed out in *Harlan,* supra at 109, there was no such privilege at common law, and arises, if at all, statutorily.

For many years prior to 1976 when the Uniform Rules of Evidence were adopted in Arkansas, the law was encompassed in Ark.Stat.Ann. § 28–607 (1947). *Baker v. State,* 276 Ark. 193, 637 S.W.2d 522 (1982) and *Oxford v. Hamilton,* 297 Ark. 512, 763 S.W.2d 83 (1989). That statute established a limited or conditional privilege. After establishing the privilege, the provision specifically provided that "there is no privilege ... as to information concerning the

condition of the patient" if, among other reasons, the patient has "tendered" that issue.

The statute goes on to provide:

(B) When a party mentioned in Subsection (A) tenders the issue of the condition of a patient under said Subsection, such party shall, within ten (10) days after receipt of the written request by another party:

(1) Furnish to the requesting party copies of all medical reports previously or thereafter made by any treating or examining medical expert received by such party or his counsel;

(2) Provide written authority signed by the party of whom request is made to permit the inspection and disclosure of all hospital or medical records and information, concerning the physical, mental or blood condition of such patient as to whom the above Subsection (A) applies.

Thus, prior to 1976, it was the public policy of Arkansas, announced by the Arkansas legislature, the governmental unit with the right and responsibility to make such determinations, that a patient could prevent a treating doctor from disclosing information about his condition and such treatment except under certain specifically described circumstances. A very important exception, at least where personal injury claims were pursued, was that in such case the patient waived the privilege created. Not only was that true, but the patient was required to, immediately after a claim was made, provide the other party with "copies of all medical reports previously or thereafter made" and was required to sign and deliver to such other party written authority "to permit the inspection and disclosure of all hospital or medical records and information, concerning the physical, mental or blood condition of such patient"

Thus, prior to 1976 it was customary in Arkansas for a defendant in a personal

---

**3.** The court recognizes that there are occasions where the court must construe ambiguous legislative pronouncements, or where the law is not clear, and, in those cases the court has no alternative but to consider many factors in reaching a decision. In this case, if the court believed that the rules discussed below were ambiguous, it would then engage in the thought processes and undoubtedly the discussion exemplified in the cases cited and discussed in section II and III of this opinion.

injury case, through his attorney (usually retained by the insurance carrier of the defendant), to immediately request not only medical reports on the condition of the plaintiff, but also to demand that a "release" or "medical authorization" be signed by the plaintiff and provided to counsel for defendant so that defendant could obtain, without any judicial intervention, all medical records and other information relating to plaintiff's condition and treatment. Because of the specific provisions of the statute requiring this, plaintiff had no choice but to comply.

In 1976 Arkansas adopted the Arkansas Rules of Evidence, which contained in Rule 503 a provision regarding physician-patient privilege. Such adoption repealed the statutory provision on this subject discussed above. Rule 503 as initially adopted created the privilege and then created certain exceptions. Among them was one that excepted from the privilege medical information relevant to a patient's medical condition "in any proceeding in which he relies upon the condition as an element of his claim or defense." The rule and related provisions of the Arkansas Rules of Civil Procedure were silent on whether defendants still had the right to obtain the information and medical authorization earlier specifically authorized and required by the former provisions of Arkansas law.

In the years following 1976, this court, and presumably most other trial courts, were immediately faced with a bevy of motions and briefs, usually if not always filed by counsel for defendants, saying, in essence, "make the plaintiff provide me

with the medical reports and medical authorization to which I am accustomed."

In many cases, at least in the first few years after 1976, many attorneys making such motions, and the lawyer on the other side, did not seem to realize that Ark.Stat. Ann. § 28–607 had been repealed. When that was called to their attention by the court and authority for their contention was requested, counsel pointed to the provisions of Rule 503 arguing, in essence, that a plaintiff, in filing a lawsuit, waived the privilege, so he should be required to provide the medical authorization as in the past. Without a single exception, this court, when faced with that issue, ruled that the "law was clear" and there was simply then no provision of law that authorized the court to require production of medical reports or the obtaining of medical records *ex parte*.[4] In answer to the frequent argument that it was "better" for the judicial process for parties to do medical discovery in the informal manner previously authorized without the necessity of motions and court hearings, this court frequently said that it was up to the legislature to make such provisions if it thought that was "better", and it had not done so, and, in fact, by repealing § 28–607 and not including similar provisions in either the Rules of Evidence or Rules of Procedure, it, perhaps, intended that result.[5]

Effective July 1, 1991 physician-patient privilege as it exists in Arkansas was again changed by amendments to Rule 503 of the Rules of Evidence and Rule 35 of the Rules

**4.** In fact, counsel for plaintiff provided the court, in papers supporting his motion, a copy of an order from this court entered in 1985 in *Padgett v. Monsanto Corporation, et al,* Civil No. 85–3058, specifically so holding. He seems to argue that, since the court was of that view prior to the amendments to Rule 503 to be discussed below, it naturally follows that the court should adopt the reasoning advanced by him. This court simply doesn't understand that argument if that is his contention. To the contrary, this court's holding in that respect was based on a reading of "the law" as it then existed and there was, after 1976, simply no provision of Arkansas law authorizing the court to require a plaintiff to sign a medical release allowing defendants counsel to dig through the

patients medical records and to discuss his condition with medical providers without his presence. Instead, the rules as they then existed set forth the manner in which information could be obtained from an unwilling patient and a provider who was unwilling to provide the information without "court order," and that was by the use of the discovery devices provided by the Rules of Civil Procedure.

**5.** The court recognizes that the amendments were actually adopted by *per curiam* order of the Arkansas Supreme Court exercising its constitutional and inherent power, and pursuant to Act 38 of 1973. *See Ricarte v. State,* 290 Ark. 100, 717 S.W.2d 488 (1986).

of Procedure.[6]

Rule 503 provides in pertinent part as follows:

**Rule 503. Physician and psychotherapist-patient privilege.**

\* \* \* \* \* \*

(b) General Rule of Privilege. A patient has a privilege to refuse to disclose and to prevent any other person from disclosing his medical records of confidential communications made for the purpose of diagnosis or treatment of his physical, mental or emotional condition, including alcohol or drug addiction, among himself, physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the physician or psychotherapist, including members of the patient's family.

\* \* \* \* \* \*

(d) Exceptions:

\* \* \* \* \* \*

(3) Condition an element of claim or defense. There is no privilege under this rule as to medical records or communications relevant to an issue of the physical, mental or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense, or, after the patient's death, in any proceeding in which any party relies upon the condition as an element of his claim or defense; provided, however, a patient shall not be required, by order of court or otherwise, to authorize any communication with any physician or psychotherapist other than (A) the furnishing of medical records, and (B) communications in the context of formal discovery procedures. [Amended by Per Curiam May 13, 1991, effective July 1, 1991.].

Rule 35 of the Arkansas Rules of Civil Procedure was also amended and provides in part as follows:

**Rule 35. Physical and mental examination of persons.**

\* \* \* \* \* \*

(c) **Medical Records.** Where a party relies upon his physical, mental or emotional condition as an element of his claim or defense, he shall, upon the request of any other party, execute an authorization to allow such other party to obtain copies of his medical records; provided, however, a party shall not be required, by order of court or otherwise, to authorize any communication with his physician or psychotherapist other than (1) the furnishing of medical records, and (2) communications in the context of formal discovery procedures. The term "medical records" means any writing, document or electronically stored information pertaining to or created as a result of treatment, diagnosis or examination of a patient. [Amended Per Curiam May 13, 1991, effective July 1, 1991.].

The reporter's note to this amendment states as follows:

New subdivision (c) of this rule sets out the circumstances under which a party must authorize release of his medical records to another party. It also makes plain that a party may not be required to allow an adversary to communicate with the party's physician or psychotherapist outside the formal discovery process. This safeguard is deemed necessary to protect the confidential relationship between a party and his physician or psychotherapist.

Reporter's Note to Arkansas Rule of Civil Procedure 35.

These changes to the Uniform Rules of Evidence significantly changed the law regarding physician-patient privilege. *Oxford v. Hamilton,* 297 Ark. 512, 763 S.W.2d 83 (1989). The former law protected "any information" while the Uniform Rules of Evidence only granted the privilege with respect to "confidential communications." *Id.* at 514, 763 S.W.2d 83. The "real protection is aimed at preventing a doctor from repeating what a patient told him in confidence." *Id.* (quoting *Baker v. State,*

---

**6.** The court agrees with Judge Woods that it is immaterial why or how this happened and whether, as claimed, it was the result of lobbying by the plaintiff's bar through organizations such as the American Trial Lawyers Association. See discussion in *Harlan,* supra at 114.

276 Ark. 193, 637 S.W.2d 522 (1982) (Justice Purtle dissenting)). It has been stated that "[t]he policy behind the physician-patient privilege is to encourage patients to communicate openly with their physicians and to prevent the physicians from revealing the infirmities of the patient." *Finney v. State,* 3 Ark.App. 180, 182, 623 S.W.2d 847 (1981).

The commencement of a medical malpractice case in Arkansas law results in a limited waiver by the patient of the physician-patient privilege in that action. The scope of the waiver extends to all matters pertinent to the claims being litigated. Additionally, these amendments in rather plain and unambiguous language say that, although the plaintiff, by filing a lawsuit waives the privilege to the extent described, "a patient shall not be required, by order of court or otherwise, to authorize any communication with any physician" to either obtain medical records or communicate with the other side about the plaintiff's condition outside the context of formal discovery. That's all it says—it says nothing more. The court can read and understand those provisions without employing any of the not very helpful rules of statutory construction which judges and other lawyers are wont to discuss when they support the conclusion they wish to reach. This court can read and understand what the plain and unambiguous rules, as amended, tell it without being concerned about what is the better rule and the best public policy.

When that is done, what the present law "means" to this judge is that a court will not require a patient to allow the other side to delve into his medical records and to discuss his treatment and condition with his physicians without his presence.

In order for this court to adopt plaintiffs contention in this case and order defendant's counsel to refrain from making contacts with prospective witnesses, the court would have to read something into the amendments not placed there by the drafters. The court would have to read the amendments to say "a patient shall not be required, by order of court or otherwise, to authorize any communication with any physician about the patients treatment except through formal discovery, and no physician will talk to anyone about such treatment and no lawyer representing the other party will attempt to engage in such discussion, or words to that effect." Irrespective of whether that is a desirable law, the rules as promulgated simply don't say that.

It is significant that the reporters' notes indicate that the drafters of the amendment to Rule 503 seem to have believed and intended to say just that. The note to the amendment says:

> It also makes plain that **a party may not be required** to allow an adversary to communicate with the party's physician or psychotherapist outside the formal discovery process. (emphasis supplied).

If it had been the intent to prohibit doctors and lawyers from, under any circumstances except through formal discovery, talking about the patient, it would have been a simple matter for the drafters of the amendments to have said that. It may be, as argued, that informal methods of discovery such as private conferences with witnesses are not limited by the rules and in fact should be encouraged in order to hold down the costs of litigation in general and discovery in particular. *See e.g., Filz v. Mayo Foundation,* 136 F.R.D. 165, 173 (D.Minn.1991). Absent strong public policy or statutory language specifically prohibiting such informal methods this court will not read into the law any such prohibition. The Arkansas physician-patient provisions at issue do not give the court the authority to prohibit *ex parte* communications. Instead, they simply prohibit the court from, by court order, requiring the patient to allow such *ex parte* contacts.

Clearly, the emphasis is on physician choice. The physician is free, in the exercise of his discretion, to determine whether he will participate in such informal discovery. If he is convinced that the patient has waived the privilege in respect to what he is about to tell the other side, he may "talk." On the other hand, he is free to decline to "talk" and insist upon formal

discovery in order for the parties to learn what he knows.

As the court in *Langdon v. Champion*, 745 P.2d 1371 (Alaska 1987) noted:

[I]t is strictly within the discretion of the physician whether to engage in informal or *ex parte* contacts. Thus, a physician may refuse to discuss a case without his patient and/or the patient's attorney being present, and may even require the defendant to proceed with formal discovery. A defendant cannot force a treating physician to engage in informal private conferences, nor may the physician be ordered to do so by the court. On the other hand, a plaintiff cannot prevent private conferences if the physician is willing to engage in them.

*Id.* at 1373.

As noted above, this court recognizes that there is authority in other jurisdictions that have specifically held such contacts are impermissible, even absent legislative prohibition. We also note that another federal judge within this state for whom this judge has the utmost respect has so held. We respectfully disagree with the position taken in those cases and find the holdings not to be supported by the language of the amendments to Arkansas law.[7]

While this court, as already indicated, recognizes that it is not its job to determine what the law ought to be, the court believes that a good argument can be made that the drafters of the amendments surely did not intend these amendments to accomplish what plaintiffs' attorney contends or what cases such as *Harlan* hold. It should be remembered that this is not a case in which the attorneys representing the defendants desire to go around town talking to medical providers who merely provided treatment and are not involved in the litigation in any way. This is not, for example, a simple intersection collision case in which the plaintiff is suing someone other than the doctor and seeks to prevent the doctor from talking with the attorney for the other driver about plaintiff's treatment and

condition without his attorney being present.

Instead, Dr. Ahrens and his clinic have been sued for medical malpractice. An interpretation of the rules as they presently exist as plaintiffs contend they should be interpreted, and as cases such as *Harlan* hold, would result in the plaintiff being allowed to sue Dr. Ahrens and his clinic for a large sum of money for alleged malpractice and his attorneys could talk with whomever they wish in building their case, including any of the treating medical personnel willing to talk with them, and also including prospective expert witness from around the country without the knowledge and certainly without the presence of defendant's counsel, but Dr. Ahrens could not defend himself by talking to his lawyer about what happened, nor could his attorneys interview staff members such as nurses about what they observed in respect to the treatment without plaintiffs' counsel being present.

Presumably, counsel for Dr. Ahrens could not even talk with Dr. Ahrens or other prospective witnesses from his office before or during the trial about their expected testimony without first notifying counsel for plaintiff and giving him an opportunity to be present to hear him discuss prospective testimony, trial strategy, and the like with his client. Surely the drafters of the amendments did not intend that, and this possibility or, in fact, probability if plaintiffs' contention prevails, lends credence to the argument that the drafters of the amendments intended to do exactly what the amendments say, which, again, is that no court will require a plaintiff to provide a medical authorization to the other side.

In *Langdon* the court in summarizing the authority going the other way, aptly stated:

These cases assert that merely permitting *ex parte* interviews violates the physician-patient privilege, infringes upon the patient's right to privacy, constitutes

---

7. There is no suggestion in this case that there has been any breach of the physician-patient privilege. Nor is there any evidence before the court indicating any abusive or overreaching conduct on the part of the defense attorneys.

a breach of the fiduciary and confidential physician-patient relationship, and creates conflicts of interest. These arguments prove too much. There is no breach of those various obligations unless and until the physician discloses some confidential information. Any medical information relevant to the condition put in issue by the plaintiff is simply not privileged and can be freely disclosed.

The possibility of intentional or inadvertent disclosure of confidential information does not cause us major concern. If a physician is worried about a breach of confidentiality, he can always refuse to involve himself in informal *ex parte* interviews or condition his compliance on the presence of plaintiff's and/or his own attorney. As to the possibility of intentional misconduct or overreaching, it suffices to say that we refuse to speculate about or impute such sinister motives to defense counsel or treating physicians. Moreover, adequate remedies exist if any such abuses do in fact occur. Indeed, we believe that to disallow a viable, efficient, cost effective method of ascertaining the truth because of the mere possibility of abuse, smacks too much of throwing out the baby with the bath water.

*Langdon v. Champion,* 745 P.2d 1371, 1375 (Alaska 1987) (citations omitted). *See also MacDonald v. United States,* 767 F.Supp. 1295 (M.D.Pa.1991).

As already indicated, the provisions of the amendments are so clear and unambiguous that the court has not resorted to a discussion of public policy in Arkansas. However, even if the court thought that made a difference, the cases cited by the parties and the court's own research has not revealed any clearcut public policy in this state which would indicate such communications are prohibited. In fact, prior to 1976, they were not only permitted but encouraged and required by legislative enactment passed by the political body authorized to make policy by our constitution, and nothing in the amendments discussed indicates such a drastic change in public policy was intended.[8]

For the reasons stated, the plaintiffs' motion will be denied. A separate order in accordance herewith will be concurrently entered.

---

**8.** In fact, the court at least "wonders" whether, under our system of government, it is proper for the Arkansas Supreme Court, by a simple *per curiam* order purporting to do nothing more than adopt amendments to the Rules of Evidence and Rules of Civil Procedure, to work such an important change in the law and public policy in respect to physician-patient privilege. This court doubts that this separate but equal "third branch of government" intended that.